OPINION
{¶ 1} Defendant-appellant Shawn Patrick Armstrong appeals from his conviction and sentence for Burglary, Failure to Comply, and Receiving Stolen Property. Armstrong contends that the trial court demonstrated bias against him and favoritism toward the prosecutor. He also contends that the trial court erred by failing to suppress testimony and evidence regarding witness identifications. Armstrong claims that the trial court improperly denied him the opportunity to present an affirmative defense of retribution and that the trial court committed numerous evidentiary errors. He also claims that the trial court erred by denying his request for a continuance, by failing to order a competency evaluation, and that the trial court erred in sentencing. Armstrong contends that he was denied the effective assistance of counsel and that the convictions were not supported by the evidence.
 {¶ 2} We conclude that the record does not support Armstrong's claims of bias and favoritism. We further conclude that the trial court did not err in its decision denying suppression of identification evidence or in denying the defense's attempt to introduce the defense of retribution. From our review of the record, any evidentiary errors committed by the trial court were not prejudicial to Armstrong and thus do not require reversal of his conviction. The trial court's denial of Armstrong's motion for a continuance and its failure to order a competency evaluation were not error. We further find that the record does not support Armstrong's claim that counsel was ineffective or that the evidence does not support the conviction. Finally, we conclude that the trial court did not err in sentencing.
 {¶ 3} The judgment of the trial court is affirmed.
 I {¶ 4} On March 21, 2002, Donald Williams was outside of his home in Huber Heights when he saw a black minivan in his driveway. He noticed a woman in the passenger seat of the van. Williams then came upon an individual trying to "jimmy" the lock on the front door of the residence. Upon being questioned by Williams, the individual stated that he was there to do some work for a person whose name Williams could not recall at the time of trial. Williams informed the individual that he had the wrong house. Williams watched as the individual left in the van. Williams then called the police and reported the incident and the license plate number of the van.
 {¶ 5} Officers from the Huber Heights Police Department responded to a dispatch regarding Williams' report. Officers located the van at the home of Katherine and Gary Abney, just down the road from the Williams residence. The officers attempted to prevent the van from leaving, but the driver drove through the Abney's yard onto the road and began fleeing from the police at high speed on several different roads and highways. The van eventually ran into a traffic sign and crashed.
 {¶ 6} It was determined that the van belonged to Steven Terhune and that it had been stolen from Terhune's place of work. It was also determined that the Abney's residence had been burglarized.
 {¶ 7} The driver of the van fled into a wooded area and eluded capture. The passenger, Angelica Stephens, was arrested. Stephens appeared as though she were barely able to stay awake. She told Huber Heights Detective Mike Noll that the driver was a white male named "Shawn." She also stated that Shawn had a tattoo on his abdomen and that he went by the street name of "J." Finally, she gave a description of the clothes that Shawn had been wearing.
 {¶ 8} Detective Noll and Detective Tom Milligan were assigned to investigate the identity of the driver. They gathered photographs of white males named Shawn with whom the police had had prior encounters. Angelica Stephens picked out a picture of an individual named Shawn Plessinger as the perpetrator.[1] The police then took the photographs and showed them to people in the areas where they believed Plessinger spent time. Teddie Skinner was one of the people to whom the photographs were shown. Several people told the police that Plessinger's photograph looked the most like the man known as Shawn, or "J."
 {¶ 9} The police then put together a photographic array that included Plessinger's photograph. From that array, Huber Heights police officer Victor Oakes identified Plessinger as the man who eluded the police. However, he noted that the individual who eluded the police had facial hair and longer hair not depicted in the Plessinger photo. The photographic array was show to Donald Williams, but he did not identify anyone. Thereafter, a warrant was issued for Shawn Plessinger.
 {¶ 10} Later, Detective Noll received an anonymous telephone call informing him that the "Shawn" that the police were looking for was in Grandview Hospital, under guard, in the custody of the Dayton Police Department. Upon arriving at the hospital, they found Shawn Armstrong in a room, under guard. He was unconscious. A hospital security guard lifted up Armstrong's gown to reveal a tattoo on his abdomen that said "money and love" in large lettering. The police took pictures of Armstrong's face and abdomen. They also realized that they had mistakenly taken out a warrant for Plessinger and promptly caused that warrant to be rescinded.
 {¶ 11} The pictures of Armstrong's tattoo were shown to Angelica Stephens, who recognized it as the same tattoo that the Shawn driving the van from the burglary scene had had on his abdomen. A photographic array was put together, with Armstrong's picture included. That array was then shown to Stephens and Skinner, who both identified Armstrong as the Shawn in question. Skinner then gave a written statement to the police and indicated that she knew Armstrong through one of her friends. She stated that she knew that Armstrong had spoken about eluding the police and lying in a creek bed for a couple of hours while police were searching for him. She also said that Armstrong had muddy clothing in her home.
 {¶ 12} Armstrong was indicted on one count of Burglary, in violation of R.C. 2911.12(A)(3), one count of Failing to Comply with an Order of a Police Officer, in violation of R.C. 2921.331(B) and (C)(5), and one count of Receiving Stolen Property, in violation of R.C. 2913.51(A). Following a jury trial, Armstrong was convicted as charged. He was sentenced to the maximum possible sentence for each offense. The trial court ordered these sentences to run consecutively.
 {¶ 13} From his conviction and sentence, Armstrong appeals.
 II {¶ 14} Armstrong's First Assignment of Error states as follows:
 {¶ 15} "The verdict should be reversed because the trial court violated appellant's right to a neutral and detached magistrate pursuant to the due process clauses of the fifth andfourteenth amendments to the united states constitution, and article I, section ten of the ohio constitution, and unconstitutionally interfered with appellant's ability to obtain counsel of his choosing."
 {¶ 16} Armstrong contends that his convictions must be reversed because the trial judge was prejudiced against him and showed favoritism toward the prosecutor. He also contends that the actions of the trial court denied him the ability to obtain trial counsel of his choosing.
 {¶ 17} Armstrong first argues that the trial court erred by denying his motion seeking recusal of the trial judge. This motion was based upon Armstrong's belief that the judge was biased and prejudiced against him. He cites several instances from the pre-trial record that he claims support his argument of bias.
 {¶ 18} From our review of the record, we find no evidence of bias with regard to any of the cited examples. For example, Armstrong claims that during a scheduling conference he sought permission to speak and that the judge replied, "I would prefer you didn't." While the judge did make such a statement, a review of the transcript reveals that Armstrong was represented by counsel during that conference, that counsel was present, and that it appears that the trial court preferred to let counsel make any necessary statements. Indeed, the trial court then proceeded to permit Armstrong to speak during the remainder of the conference and appeared to answer all of his concerns. We also note from a review of all the transcripts submitted with this appeal, that Armstrong often appeared belligerent, arguing with the trial judge at every opportunity. Despite this, the record reflects that the trial judge still conducted the trial in a fair and impartial manner.
 {¶ 19} In any event, we note that if Armstrong believed the trial court judge to be biased against him, his remedy was to file an affidavit of prejudice with the Supreme Court of Ohio, as provided for in R.C. 2701.03, which requires the Chief Justice of the Ohio Supreme Court or his designee to determine whether the judge is biased or prejudiced. This statute provides "the exclusive means by which a litigant may claim that a common pleas judge is biased and prejudiced" and prevents a court of appeals from addressing that issue. State v. Scruggs, Franklin App. No. 02AP-621, 2003-Ohio-2019, ¶ 15, citations omitted.
 {¶ 20} We next turn to the claim that the trial court expressed favoritism toward the prosecutor. Defense counsel attempted to read portions of a police officer's report while the officer was on the stand. The prosecutor objected, and the following sidebar was conducted:
 {¶ 21} "Prosecutor: If the report is to refresh recollection then he can read it, ask him if it's refreshed, and — and then the — and then the officer can testify. We have a live witness here. The police report's not —
 {¶ 22} "Trial counsel: Yeah, I agree. I agree. She is correct. I'm incorrect. Thank you.
 {¶ 23} "Trial Court: She's always correct."
 {¶ 24} Armstrong contends that this statement shows bias on the part of the trial judge in favor of the State. We disagree. This is the only statement by the trial court suggesting the infallibility of the prosecutor in more than six hundred fifty pages of transcript. We construe the trial court's remark as nothing more than a sardonic comment intended to ease any discomfort defense counsel may have experienced in having to concede that the prosecutor's objection was well-taken. The statement was made outside of the hearing of the jury. The trial court made numerous rulings against the State during the course of this trial, so that the trial judge obviously did not literally believe that the prosecutor was infallible.
 {¶ 25} Of more concern is Armstrong's claim that the trial court interfered with his ability to obtain counsel of his choosing. According to the record, Armstrong's original appointed trial counsel withdrew from the case after receiving what he perceived to be threats by Armstrong. The record also indicates that Armstrong attempted to intimidate certain witnesses in order to prevent them from testifying. Therefore, after appointing new counsel, the trial court ordered that Armstrong's bond be increased and that he not be permitted any contact, by telephone or in person, with anyone except that he was "permitted telephone or personal contact with attorneys licensed to practice in the State of Ohio."
 {¶ 26} Armstrong contends that this order prevented him from contacting family members who would have made arrangements to hire a private attorney. However, the record reflects that the court did not prevent Armstrong or members of his family from contacting any attorney. The record further reflects that Armstrong's appointed counsel made efforts to contact all necessary parties in an attempt to determine whether private counsel would be retained. Furthermore, it appears from the record that once Armstrong was informed that the State was not required to pay for privately retained counsel, Armstrong did not pursue the issue.
 {¶ 27} Armstrong's First Assignment is overruled.
 III {¶ 28} Armstrong's Second Assignment of Error is as follows:
 {¶ 29} "The verdict should be reversed because the trial court erred by not granting appellant's motion to suppress, and admitting evidence in violation of appellant's rights under thefourth amendment to the united states constitution and article I, section 14 of the constitution of Ohio, his rights under the due process clauses of the fifth andfourteenth amendments to the united states constitution, and article I, section ten of the ohio constitution, and appellant's right to counsel under the sixth amendment to the united states constitution."
 {¶ 30} Armstrong contends that the trial court erred by denying his motion to suppress all identification evidence, and by denying his motion to suppress evidence that he had a tattoo on his abdomen.
 {¶ 31} We begin with the issue of whether the trial court erred by permitting eyewitness identification of Armstrong to be introduced. Armstrong contends that the identifications made by Don Williams, Teddie Skinner and Angelica Stephens were unreliable.
 {¶ 32} We turn first to the identification made by Don Williams. Williams did not make a pre-trial identification of Armstrong, and instead identified Armstrong in his trial testimony. Armstrong contends that this identification is unreliable, because Williams originally told the police that the suspect was approximately five feet four inches tall, whereas Armstrong is actually five feet ten inches in height.
 {¶ 33} The jury could reasonably have concluded that Williams, who testified that his driveway was sloped, and that he was standing higher than Armstrong during their encounter, is not a good judge of height. Conversely, the jury could have chosen to disregard the identification made by Williams. We conclude that this issue is best resolved by a jury, which was in a better position than this court to judge the credibility of Williams, and the weight to be assigned to his identification testimony.
 {¶ 34} Armstrong also contends that the identifications made by Skinner and Stephens, during and prior to trial, were unreliable. We are not unmindful of the fact that upon being presented with several individual photographs, Stephens originally identified Shawn Plessinger as the perpetrator. The record indicates that Stephens was in a "crack coma" at the time of this identification and was lethargic and having trouble keeping her eyes open. The record also indicates that Plessinger was similar in appearance to Armstrong. As with Williams's identification testimony, we conclude that the reliability of Stephens's in-trial identification of Armstrong is best left to the jury, which could determine whether Stephens appeared credible when she identified Armstrong during trial.
 {¶ 35} With regard to the pre-trial identifications, we note that both Skinner and Stephens were presented with photographic arrays from which they identified Armstrong as the suspect. With regard to the issue of the identification made from the photographic array, we note that in order to justify suppressing the pretrial identification, Armstrong must demonstrate: (1) that the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification; and (2) that the identification in fact was unreliable under the totality of the circumstances. State v. Gooden,
Montgomery App. No. 19231, 2003-Ohio-905, ¶ 15, citation omitted. In other words, even if an identification procedure is overly suggestive, the identification remains admissible if sufficient evidence of reliability exists. A determination of reliability is unnecessary, however, where an identification procedure is not unduly suggestive.State v. Glass (March 9, 2001), Greene App. No. 2000 CA 74.
 {¶ 36} In this case, we find nothing suggestive about the photographic arrays presented to Skinner and Stephens. All of the men included in the array are similar in appearance; none has any distinguishing or distinctive features. Therefore, we conclude that a determination of the reliability of these identifications is unnecessary.
 {¶ 37} Finally, we address the contention that the trial court should have suppressed evidence regarding the tattoo on Armstrong's abdomen. In support, Armstrong contends that the evidence, which consists of a photograph taken by the police while he was in the hospital, was obtained without his permission and without a warrant. Armstrong has submitted no authority, and we are aware of none, holding that the taking of a photograph of a tattoo, on the person of a suspect in custody, in a hospital, is an unreasonable search and seizure.
 {¶ 38} Armstrong argues, further, that it was an unduly suggestive procedure for the police to have shown eyewitnesses a photograph, or a set of photographs, featuring both the tattoo and Armstrong's face. Even if this argument would otherwise have merit, there is nothing in the record reflecting that any eyewitness was, in fact, shown a photograph, or a set of photographs, that featured both the tattoo and Armstrong's face. Thus, the record fails to portray this assigned error.
 {¶ 39} Armstrong's Second Assignment of Error is overruled.
 IV {¶ 40} The Third Assignment of Error provides as follows:
 {¶ 41} "The verdict should be reversed because the trial court committed error in granting the state's motion in limine and preventing appellant from presenting his defense in violation of his rights under the due process clauses of the fifth andfourteenth amendments to the united states constitution, and article I, section ten of the ohio constitution, as well as appellant's right to counsel under thesixth amendment to the united states constitution."
 {¶ 42} Armstrong contends that the trial court prevented him from presenting evidence regarding his "defense of retribution." The facts relevant to this argument are as follows: Some time after the alleged burglary, Armstrong "was involved in a foot chase with the Dayton Police Department." Armstrong claims that the Dayton Police caught him, and that he was "beaten to a point as to cause the loss of consciousness". Armstrong contends that the Dayton Police had an incentive to inform the Huber Heights Police Department that he was in custody and to have him charged with the charges with which this appeal is concerned, so "he would have no credibility as far as a civil lawsuit against the City of Dayton" with regard to the claimed excessive force associated with the arrest.
 {¶ 43} The State filed a motion in limine to exclude the presentation of any evidence regarding the arrest by the Dayton Police Department, contending that this evidence might tend to confuse the jury. The trial court held a hearing on the motion. During the hearing, counsel for Armstrong admitted that there was no evidence of a "conspiracy between the Dayton Police Department and Huber Heights," and that he and Armstrong had "no idea whether they [the Dayton Police] talked to them [the Huber Heights Police] at all."
 {¶ 44} In granting the State's motion, the trial court held:
 {¶ 45} "I'm going to rule that basically this is a collateral issue and it's of marginal probative value. That to admit the evidence of this conspiracy or this retribution probability or possibility is extremely remote, and it would — there would be a danger of unfair prejudice or confusion, and it would certainly cause a delay that would not be in the interest of justice for us to pursue this. I'm not preventing you from pursuing it, of course, over the next week, but I'm telling you that I'm not granting the continuance based on that. * * * Unless you find something a whole lot stronger, that the Motion in Limine will be granted as well."
 {¶ 46} We concur with the decision of the trial court. Whether Armstrong was beaten and arrested by members of the Dayton Police Department has no bearing on the issue of whether he committed the offenses with which this appeal is concerned. Even if the Dayton Police Department were responsible for the anonymous call to the Huber Heights Police Department, Armstrong's culpability for these offenses would not thereby be vitiated or even mitigated. Therefore, the claimed defense of retribution does not provide a defense under the facts of this case.
 {¶ 47} The Third Assignment of Error is overruled.
 V {¶ 48} Armstrong's Fourth Assignment of Error is as follows:
 {¶ 49} "The verdict against appellant should be reversed due to evidentiary error which violated appellant's rights under the due process clauses of the fifth andfourteenth amendments to the united states constitution, and article I, section ten of the ohio constitution, as well as appellant's right to counsel under thesixth amendment to the united states constitution."
 {¶ 50} Armstrong contends that the trial court made numerous errors with regard to evidentiary issues. Specifically, he contends that the trial court abused its discretion when it (1) permitted Teddie Skinner to read her written statement; (2) refused to order the State to disclose grand jury testimony; (3) permitted the State to ask leading questions of its witnesses; (4) refused to permit the defense to subpoena a prosecutor to testify regarding her decision to file a complaint for the instant offenses against Shawn Plessinger; and (5) refusing to admit defense exhibits H, I, J and K.
 {¶ 51} Trial courts have broad discretion in determining the admissibility of evidence and their rulings will not be reversed on appeal absent an abuse of discretion which prejudices an objecting party.State v. Sage (1987), 31 Ohio St.3d 173, 180. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 52} We turn first to the claim that the trial court erred by permitting Teddie Skinner to read her written statement, while testifying at trial. Armstrong argues that this violated the rules pertaining to hearsay evidence. The State concedes error in this instance, noting that there was no indication that Skinner needed to read from the statement in order to refresh her recollection.
 {¶ 53} We have reviewed the written statement and can find no prejudice stemming from the error. We note that a portion of the statement was redacted, and thus, was not presented to the jury for its consideration. With regard to the remainder of the statement, we conclude that the portions complained of as hearsay were merely cumulative, because Skinner testified directly concerning statements Armstrong made to her. Therefore, we find any error arising from the reading of Skinner's out-of-court written statement to have been harmless.
 {¶ 54} We next address the claim the trial court abused its discretion by denying Armstrong's request for grand jury transcripts. Specifically, Armstrong contends that he was entitled to these transcripts with regard to the complaint filed against Shawn Plessinger in case number 2002-CR-1027, concerning the same incidents with which the charges involved in this appeal are concerned. Armstrong also sought the grand jury transcripts from this case and from another complaint filed against him in case number 2002-CR-1064. Armstrong's stated reasons for obtaining the transcripts was to compare the three in order to find any contradictory testimony.
 {¶ 55} "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." State v. Greer (1981), 66 Ohio St.2d 139, syllabus, citation omitted. The trial court is vested with the discretion to determine whether the defendant has shown a particularized need for the production of grand jury proceedings. Greer at 148.
 {¶ 56} From our review of the record, it appears that no grand jury proceedings were had in either the Plessinger case or in case number 2002-CR-1064. While we note that there was a grand jury proceeding in the instant case against Armstrong, we do not find that the trial court abused its discretion in denying him access to that testimony. Armstrong's stated reason for requesting the transcript fails to show a particularized need, since two of the requested transcripts do not appear to exist. Also, since there are no grand jury transcripts in the other two cases, we agree with the trial court's finding that "there is no comparison to make," so that the request was properly overruled.
 {¶ 57} Next Armstrong contends that the trial court abused its discretion by permitting the State to lead its witnesses. Armstrong fails to make specific citations to the record other than to suggest that we review the testimony of Skinner and Stephens. We have read the entire transcript, including the testimony of Skinner and Stephens. However, without specific citations to the record as required by App. Rule 16 (D), and without any statement of prejudice resulting from any such error, we decline to address this issue.
 {¶ 58} Armstrong also argues that the trial court abused its discretion by denying his request to call Prosecutor Julie Bruns as a witness. Armstrong wanted to have Bruns "testify that the police brought her enough evidence to file a Complaint against Shawn Plessinger," and that "she approved a number of charges because she believed they had a probable cause to charge Shawn Plessinger."
 {¶ 59} Even were we to find that the trial court did abuse its discretion, we would decline to find prejudice stemming therefrom. In this case, Bruns would merely have testified that she filed charges against Plessinger for the offenses committed by Armstrong, based upon statements made to her by the Huber Heights police. Given that the jury was fully informed of the fact that the Huber Heights Police Department had originally obtained a warrant for Plessinger because they originally thought he was the perpetrator, we conclude that any testimony by Bruns would most likely have been cumulative.
 {¶ 60} Finally, Armstrong contends that the trial court abused its discretion by denying his request to admit four of his trial exhibits; specifically letters written to Armstrong by Tina Farler. The gist of each letter is Farler's statement that she wanted the opportunity to provide an alibi for Armstrong, because she claimed that Armstrong was with her during the time frame that the offenses were committed. One of the letters also contained a statement that Farler was "being pressured to testify" at trial. Armstrong does not advance any argument in favor of his position, but it appears that he wanted to use the letters to impeach Farler's testimony against him at trial. Also, Armstrong does not state how the decision to deny admission of these letters resulted in prejudice.
 {¶ 61} We conclude that even if the failure to admit these letters was error, Armstrong can show no prejudice. From our review of the transcript, it is evident that the pertinent information contained within these letters was brought to the attention of the jury, and that the jury was made aware of the inconsistency between Farler's testimony and her initial decision to provide alibi evidence.
 {¶ 62} The Fourth Assignment of Error is overruled.
 VI {¶ 63} Armstrong's Fifth Assignment of Error states as follows:
 {¶ 64} "The verdict should be reversed because the trial court failed to give appellant's trial counsel a continuance which deprived appellant of his rights under the due process clauses of the fifth andfourteenth amendments to the united states constitution, and article I, section ten of the ohio constitution, as well as appellant's right to counsel under the sixth amendment to the united states constitution."
 {¶ 65} Armstrong contends that the trial court abused its discretion by denying his motion for a continuance of the scheduled trial date.
 {¶ 66} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." State v. Unger (1981), 67 Ohio St.2d 65, 67, internal citations omitted. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v.Adams (1980), 62 Ohio St.2d 151, 157. "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Unger, supra at 67, citation omitted.
 {¶ 67} Armstrong contends that his counsel needed a continuance in order to pursue his defense theory of retribution and in order to interview witnesses regarding the theory that someone else had committed the offenses.
 {¶ 68} As we have previously noted, Armstrong's theory of retribution does not present a defense to the charges. With regard to the issue of whether other persons had committed the offenses, the trial court could reasonably have concluded that Armstrong had already had ample time to investigate the facts with a view to developing alternative theories implicating others as the perpetrator. We conclude that the trial court did not abuse its discretion by denying the motion.
 {¶ 69} The Fifth Assignment of Error is overruled.
 VII {¶ 70} The Sixth Assignment of Error states:
 {¶ 71} "The verdict against appellant should be reversed because he received ineffective assistance of counsel in violation of his rights under the due process clauses of thefifth andfourteenth amendments to the united states constitution, and article I, section ten of the ohio constitution, as well as appellant's right to counsel under thesixth amendment to the united states constitution."
 {¶ 72} Armstrong contends that he was denied the effective assistance of trial counsel. Specifically, he claims that trial counsel was ineffective because he failed to: (1) adequately argue the motion to suppress identification evidence; (2) proffer evidence regarding his retribution theory during trial; (3) use the proper method for seeking recusal of the trial judge; (4) object to leading questions by the prosecutor; (5) object to the use of a witness's written statement; and (6) make a proper closing argument.
 {¶ 73} In order to establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that prejudice occurred due to the deficiency. Strickland v. Washington
(1984), 466 U.S. 668. "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v. Bradley
(1989), 42 Ohio St.3d 136, at paragraph two of the syllabus. Further, "[t]o show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.
 {¶ 74} We begin with the claim that counsel's argument, regarding the motion to suppress identification, was inadequate. It appears that the only basis for this argument is the fact that the motion was overruled. We have reviewed the motion to suppress, as well as the hearing on the motion and we do not conclude that counsel's argument was inadequate. Indeed, it appears to this court that counsel raised appropriate arguments regarding the credibility of the witnesses and the circumstances surrounding the identifications.
 {¶ 75} Next, we address the claim that counsel failed to properly proffer evidence regarding his defense theory of retribution. This argument fails because the record adequately reflects the basis for this theory. Additionally, counsel proffered all of his supporting documentation during trial.
 {¶ 76} Armstrong next contends that counsel's representation was deficient because he failed to seek recusal by means of an affidavit of prejudice, pursuant to R.C. 2701.03. Again, we note that Armstrong's claim that the trial court exhibited prejudice or bias against him is not borne out by the record. Therefore, we cannot say that counsel was ineffective for failing to seek recusal through the Ohio Supreme Court.
 {¶ 77} Armstrong also contends that counsel was ineffective for failing to object when the prosecutor asked leading questions of the State's witnesses. Armstrong fails to cite us to any portion of the record in support of this contention. Additionally, we note that our review of the record reveals instances where objections to leading questions were made. Furthermore, defense counsel's decisions regarding whether to object to certain leading questions may have been a sound strategic decision. Unless counsel has reason to believe that the leading nature of the questions is shaping the testimony adversely, it is often unwise to object, because the same testimony, offered without the impetus of leading questions, may be more impressive to the jury. Without more to support this argument, we cannot conclude that Armstrong has demonstrated that counsel's conduct was deficient.
 {¶ 78} Next, Armstrong argues that the written statement made by Teddie Skinner should not have been admitted in evidence and that counsel was ineffective for failing to object thereto. This argument is without merit; the record reflects that counsel did make an objection, that a side-bar conference was held, and that the objection was overruled.
 {¶ 79} Finally, Armstrong contends that counsel inappropriately commented upon Armstrong's silence during trial by making the following statement:
 {¶ 80} "I don't think that I could sit in his spot [Armstrong] and not get up and say something."
 {¶ 81} Armstrong contends that this statement deprived him of a fair trial necessitating a reversal of his conviction.
 {¶ 82} We have reviewed the closing argument, and the passage containing the above statement. That passage reads as follows:
 {¶ 83} "It's also a privilege to represent individuals like Shawn Armstrong. He's been sitting here the entire length of the trial and he's sitting here quietly today on my advice because the State is responsible for proving proof beyond a reasonable doubt. Everything that was up here. And that's the crux of the matter.
 {¶ 84} "Do you believe an individual like this, Shawn Armstrong, did exactly everything that was up there? This person here in this courtroom did everything that was done on this presentation? In a different world I would invite you all to my house and I can have you all sit down and I can give coffee and milk and Krispy Kreme doughnuts, which they've saved a couple for me today, thank you — and we could sit down and we can discuss it. We can go over everything.
 {¶ 85} "What do we know about this? What do we know about that? What do we know about reputation? What do we know about backgrounds? What do we know about the facts?
 {¶ 86} "And we can sit there and calmly and collectively do this and you would know me and I would know you and we'd know everything about this. But we have to do things a little differently in the courtroom. We have to show you everything exactly, and unfortunately, they're not silly little rules; they're important rules for certain ways of presentation. So we can't do that.
 {¶ 87} "We have do it here. And Shawn Armstrong has to put his hands in a handful of strangers' hands, and that's got to be one of the scariest things you've ever done. I don't think that I could sit in his spot and not get up and say something. If you'd ask my wife, she would tell you, I couldn't do it. I couldn't let somebody else do that for me. So what are we here to talk about?"
 {¶ 88} While we agree that counsel's statement is inartful, we cannot say that his comment was intended to, or did, violate his client's right to remain silent without comment. Instead, it appears that counsel was arguing that it is difficult to present an accurate, complete picture of the facts and circumstances of this case, given the constraints of the judicial system. It also appears that counsel's statement was directed to the fact that his client, who was portrayed by the State as a drug addict, was a quiet, calm person who did not fit the profile suggested by the prosecution. In any event, we cannot say that this one comment caused the jury to convict Armstrong.
 {¶ 89} The Sixth Assignment of Error is overruled.
 VIII {¶ 90} Armstrong's Seventh Assignment of Error provides as follows:
 {¶ 91} "The verdict should be reversed because the trial court failed to order a competency evaluation despite that issue being raised at pre-trial conferences."
 {¶ 92} In this Assignment of Error, Armstrong argues that the trial court abused its discretion by failing to order a competency hearing. In support, he contends that since the issue was raised by the trial court during a pre-trial conference, he was constitutionally entitled to such an evaluation. During that conference, the trial court made the following statement to Armstrong and counsel:
 {¶ 93} "* * * And you've also said you don't understand what's going on here. I would ask your attorney * * * and Mr. Susco, what we're going to do is I'm going to ask you to evaluate, and I'll trust your judgment on this, as to whether this gentleman needs — there's a need for a competency evaluation, whether he does or does not understand what's going on. If you believe that he does need a competency evaluation, then I'll be open to that. Okay?"
 {¶ 94} The decision to order a competency evaluation is vested in the sound discretion of the trial court, and its decision cannot be reversed absent a showing of an abuse of discretion. See, State v. Arnott, Summit App. No. 21989, 2005-Ohio-3, ¶ 23. "[T]he right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains `sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." State v. Berry, 72 Ohio St.3d 354, 359,1995-Ohio-310.
 {¶ 95} In this case, it appears that because Armstrong indicated that he did not understand how the State could continue to "railroad" him that the trial court alerted trial counsel, who had just been appointed to represent Armstrong, of the possible issue. Also, the trial court did not state that there was any other indication that Armstrong was incompetent to stand trial, and left the matter to counsel's discretion.
 {¶ 96} We have reviewed the record, and find nothing to indicate that Armstrong was incompetent to stand trial. Indeed, Armstrong never sought a competency evaluation. Interestingly, he does not even argue on appeal that he was incompetent. Therefore, we conclude that the trial court did not abuse its discretion when it did not order a competency evaluation.
 {¶ 97} The Seventh Assignment of Error is overruled.
 IX {¶ 98} Armstrong's Eighth Assignment of Error states as follows:
 {¶ 99} "The jury verdict should be reversed because there is insufficient evidence to warrant a conviction, and the verdict is against the manifest weight of the evidence."
 {¶ 100} Armstrong contends that the evidence in the record does not support a conviction.
 {¶ 101} This court has addressed the issue of sufficiency of the evidence on many occasions. Recently in Dayton v. Turic, Montgomery App. No. 20169, 2005-Ohio-131, we stated:
 {¶ 102} "Criminal Rule 29(A) provides that the trial court shall enter a judgment of acquittal on one or more offenses charged in the indictment if the evidence is insufficient to sustain a conviction of such offense or offenses. `[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. Statev. Dennis, 79 Ohio St.3d 421, 430, 1997-Ohio-372. A guilty verdict will not be disturbed on appeal unless `reasonable minds could not reach the conclusion reached by the trier-of fact.'" Id. at ¶ 19.
 {¶ 103} In contrast, "[w]hen a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact `clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Dayton v. Turic, supra at ¶ 20, citation omitted. "Because the trier of fact sees and hears the witnesses and is particularly competent to decide `whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." Id., citation omitted. "A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." Id., citation omitted.
 {¶ 104} Armstrong was convicted of Receiving Stolen Property in violation of
 {¶ 105} R.C. 2913.51(A) which provides that "no person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."
 {¶ 106} The State proved that a van owned by Terhune was stolen. The evidence also shows that it was hot-wired. Donald Williams identified Terhune's van as the one that was in his driveway. The police identified the van as being involved in a chase from the Abney residence. Stephens and Williams identified Armstrong as the driver of the van. Additionally, Armstrong's girlfriend, Tina Farler, testified that Armstrong knew he was in a stolen van during the chase.
 {¶ 107} Armstrong was also convicted of Burglary in violation of R.C. 2911.12(A)(3) which states that "no person, by force, stealth, or deception, shall * * * trespass in an occupied structure * * * with purpose to commit in the structure * * * any criminal offense."
 {¶ 108} The evidence in the record indicates beyond a reasonable doubt that someone entered the Abney house through a locked door without permission. The evidence also shows that someone removed items from the home.
 {¶ 109} Donald Williams identified Armstrong as the person in the van. The van was subsequently located by the police in the Abney driveway. Stephens identified Armstrong as the perpetrator. Additionally, Skinner and Farler corroborated the identification testimony.
 {¶ 110} Finally, Armstrong was convicted of Failure to Comply in violation of R.C. 2921.331(B) which states that "no person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." He was also convicted of section (C)(5)(a)(I) of that statute which provides that a "violation of this section is a felony of the third degree if the jury * * * finds any of the following by proof beyond a reasonable doubt [that] the operation of the motor vehicle by the offender was a proximate cause of serious physical harm to persons or property."
 {¶ 111} The evidence shows that during the chase, the police activated their lights and sirens. The chase covered several roadways and highways. The evidence indicates that motorists were forced to pull over in order to avoid the van. The driver of the van was identified as Armstrong. The chase also resulted in a crash which seriously damaged the van.
 {¶ 112} Construing the evidence in the light most favorable to the State, a reasonable factfinder could determine that the State had presented sufficient evidence regarding each of the charged offenses. Moreover, a reasonable factfinder could conclude from the evidence presented that Armstrong was guilty of the charged offenses. Therefore, we conclude that the conviction is supported by sufficient evidence and that it is not against the manifest weight of the evidence.
The Eighth Assignment of Error is overruled.
 X {¶ 113} Armstrong's Ninth Assignment of Error provides as follows:
 {¶ 114} "The sentence should be reduced because there is a presumption against having consecutive sentences for multiple crimes growing out of the same incident exceeding the maximum penalty for most serious offense."
 {¶ 115} Armstrong contends that the trial court erred in sentencing. In support, he argues that there is a "presumption against having consecutive sentences for multiple crimes growing out of the same incident exceeding the maximum penalty for the most serious offense." A review of his argument indicates that Armstrong objects to the trial court's imposition of the maximum sentence allowed for each offense and to the order that those sentences to run consecutively.
 {¶ 116} R.C. 2929.14 provides: "A) Except as provided in division (C) * * * of this section * * * if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender pursuant to this chapter, the court shall impose a definite prison term that shall be one of the following:
 {¶ 117} "(3) For a felony of the third degree, the prison term shall be one, two, three, four, or five years.
 {¶ 118} "(4) For a felony of the fourth degree, the prison term shall be six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, or eighteen months."
 {¶ 119} In this case, the charges of Burglary and Failure to Comply were both felonies of the third degree, for which the trial court imposed the maximum, five-year sentence. The charge of Receiving Stolen Property is a felony of the fourth degree, for which the trial court imposed the maximum sentence of eighteen months.
 {¶ 120} When a trial court imposes maximum sentences, it must comply with R.C. 2929.14(C), which provides as follows:
 {¶ 121} "* * * the court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, [and] upon offenders who pose the greatest likelihood of committing future crimes * * *."
 {¶ 122} At the sentencing hearing the trial court found that Armstrong had committed the worst form of the Failure to Comply offense, because the highspeed chase on highways endangered the lives of the pursuing officers, persons on the highway and Stephens. The trial court also found that the amount of damage, both economic and physical, to the stolen van and to the Abney's house led to a finding that Armstrong had committed the worst form of the offenses of Burglary and Receiving Stolen Property. Further, the trial court found that Armstrong posed a great likelihood of committing future crimes based upon his significant criminal history and upon the fact that he committed these offenses while on parole. The trial court even stated that Armstrong's "history of criminal behavior shows that the only time we seem able to keep you out of trouble, the only time that we can truly make the public safe here, is when you're behind bars." Thus, we conclude that the trial court made, and the record substantiates, the requisite statutory findings to support the imposition of the longest prison terms authorized by statute.
 {¶ 123} When a trial court orders multiple sentences to be served consecutively, it must comply with the terms of R.C. 2929.14(E)(4). R.C. 2929.14(E)(4) provides that "if multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 124} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 125} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 126} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 127} The trial court found that consecutive sentences were necessary to protect the public and that the imposition of the sentences was not disproportionate to the crimes. Again, the trial court found that Armstrong's criminal history was so significant as to warrant the imposition of consecutive sentences in order to protect the public. The trial court also found that the fact that Armstrong was on parole during the commission of these offenses supported consecutive sentences. Finally, the trial court found that the damage to the stolen van, the damage done to the Abney's house and the extreme danger to which the high speed chase exposed passing motorists and police required consecutive sentences. The trial court also found Armstrong's lack of remorse significant. After reviewing the record, we agree.
 {¶ 128} Finally, Armstrong argues that R.C. 2929.19(B)(2) creates a presumption against imposing maximum and consecutive sentences. That statute provides:
 {¶ 129} "The court shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed in any of the following circumstances: * * * if the sentence is for two or more offenses arising out of a single incident and it imposes a prison term for those offenses that is the maximum prison term allowed for the offense of the highest degree by division (A) of section 2929.14 of the Revised Code, its reasons for imposing the maximum prison term."
 {¶ 130} We disagree. The statute merely requires that a trial court explain its reasons for imposing maximum sentences for each offense. Because we find that the trial court adequately explained its reasoning for the sentences imposed, we conclude that it complied with this statute.
 {¶ 131} The Ninth Assignment of Error is overruled.
 XI
All of Armstrong's Assignments of Error having been overruled, the judgment of the trial court is affirmed.
Grady and Young, JJ., concur.
[1] According to the police, at the time Angelica chose the picture of Shawn Plessinger, she was still in a very lethargic state as a result of being in a self-described "crack coma."