OPINION
{¶ 1} Defendant-appellant Terrance Greathouse appeals from his conviction and sentence for kidnapping, rape, two counts of aggravated robbery, intimidation of a crime victim, and firearm specifications on all five counts. Greathouse contends that this matter must be remanded for re-sentencing under State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, 845 N.E.2d 856. Greathouse also contends that: the jury verdicts are against the sufficiency and manifest weight of the evidence; trial counsel was ineffective in failing to raise the issue of allied offenses of similar import; the trial court abused its discretion in denying his request for new counsel; the trial court abused its discretion in failing to order a competency evaluation; the trial court erred in failing to order a mistrial after Greathouse flipped over the defense table and was tackled by deputies; the trial court improperly removed Greathouse from the trial without securing a waiver of rights; and the trial court erred in imposing court costs.
 {¶ 2} We conclude that the only assignment of error having merit is the request for remand under Foster. Accordingly, the sentence imposed by the trial court is Reversed, the judgment of the trial court is Affirmed in all other respects, and this cause is Remanded for re-sentencing in accordance with State v. Foster, supra.
 I {¶ 3} In late December, 2001, S.F., a female, left her mother's home around 7:00 a.m. to go to work. The house was located on King's Highway, in Dayton, Ohio. While scraping the car windows, S.F. noticed an individual standing across the street, at a trailer park. When S.F. went to get in the driver's side of the car, she felt a hand jab her in the back. She was told to get in the car, and was jabbed again. S.F. crawled into *Page 3 
the car, over the gearshift, and sat in the passenger seat. The person who had jabbed her put the car into gear and drove off. S.F. tried twice to look at the individual (later identified as Greathouse), but his hand pushed her face into the passenger side window. Greathouse told S.F. not to look at him. He said that he would crash the car and burn the car with her inside if she tried to look at him. Greathouse also threatened several times to kill S.F. He told her he had a gun and would shoot her and dump her body beside the car.
 {¶ 4} After driving around for a while, Greathouse pulled the car into a field next to Sunwatch Indian Village. He got out of the car, came around to the passenger side, and raped S.F. It was very painful because S.F. was menstruating and had inserted a tampon. Greathouse then returned to the driver's side, and drove to several ATMs, where he forced S.F. to withdraw money. S.F. was able to withdraw $200 at one ATM, but was unsuccessful at obtaining money at two or three other machines. Finally, Greathouse dropped S.F. off a few blocks from her home. He dumped out her purse and removed the battery from her cell phone. During the ride, Greathouse also told S.F. that he could see her house from where he lived, and that he would come back and burn her house, with her family in it, if she called the police.
 {¶ 5} S. F. walked home, went into the house, fell on the floor, and started crying. S.F. told her mother to call her church and to call her father, because she needed to go to the hospital. S.F.'s mother testified at trial and stated that S.F. was shaking and crying. S.F. said she had been raped. S.F. also told her father the same thing.
 {¶ 6} S.F. arrived at the hospital with her father and a rape examination was performed. The nurse specifically recalled the case because S.F. was extremely *Page 4 
emotional and upset and was very scared. The nurse indicated this was one of the worst cases she had seen, because S.F. was so frightened. During the pelvic exam, the doctor removed a tampon from S.F., and this evidence was placed in the rape kit, along with vaginal, oral, and rectal swabs and smears, dried stains, the victim's blood standard, a pubic hair combing and standard, fingernail scrapings, and a head hair standard. The police collected the rape kit and turned it over to the Miami Valley Regional Crime Lab.
 {¶ 7} While at the hospital, S.F. was also interviewed by a police officer. She described the suspect as a dark-complected, clean-shaven man between the ages of 25 and 35, who was about five feet, nine inches tall, and weighed around 175 pounds. Later that day, S.F. changed the description of the suspect to about six feet, two inches, and 200 pounds.
 {¶ 8} S.F. was driving a rental car (a 2002 Toyota Corolla) at the time, because she had been involved in an auto accident a few weeks earlier. The police located the Corolla around 11:00 a.m. the same day, on Forsythe Avenue, which was about three or four football fields away from S.F.'s house, as the crow flies. The Corolla was towed to the police garage and was examined for evidence, but no fingerprints were found.
 {¶ 9} Most of the evidence in the rape kit was negative for the presence of sperm. However, both the tampon and dried stain were positive for the presence of sperm, and were retained at the lab. The rest of the rape kit was sent back to the police department. DNA testing was performed on the tampon and two DNA profiles were obtained: a "known" standard for S.F., and an "unknown" standard. The latter profile was entered into a DNA database at the lab and was compared with other samples *Page 5 
throughout the local area and the state. At the time, no matches were made with the existing DNA profiles in the database.
 {¶ 10} In December, 2004, the Crime Lab was notified that the DNA sample matched another sample in the database. Greathouse was identified as the match, and the police subsequently obtained two buccal or cheek swabs from Greathouse. When those were compared with the DNA profile obtained from the tampon, the probability of finding a similar match in the general population was one in three quintillion. The numerical cutoff used by the laboratory to say that a DNA sample comes from a specific individual is one in 6.5 trillion, and the probability number obtained from this particular sample was much higher than that. Accordingly, the forensic scientist who testified for the State was able to say with a reasonable degree of scientific certainty that the DNA profile from the tampon came from Greathouse.
 {¶ 11} When Greathouse was questioned by the police, he denied knowing who S.F. was, and denied raping her. After being shown a picture of S.F., Greathouse stated that he did not know S.F. Greathouse denied having consensual sex with S.F., and said he did not know her name or her face. Greathouse also indicated that in December, 2001, he lived on Queens Avenue, near both Forsythe (where the car was found) and Kings Highway (where S.F. lived and was abducted).
 {¶ 12} Greathouse was subsequently convicted on all charges and firearm specifications, and was sentenced to a total of 50 years in prison. Greathouse appeals from his conviction and sentence.
 II {¶ 13} Greathouse's Second Assignment of Error is as follows: *Page 6 
 {¶ 14} "THE VERDICTS ARE AGAINST THE SUFFICIENCY AND WEIGHT OF THE EVIDENCE."
 {¶ 15} Under this assignment of error, Greathouse first contends that the State failed to prove that he possessed a firearm or committed a theft offense. When we review the sufficiency of evidence:
 {¶ 16} "the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. * * * A guilty verdict will not be disturbed on appeal unless `reasonable minds could not reach the conclusion reached by the trier-of-fact.'" State v. Stubbs, Greene App. No. 2005-CA-88,2006-Ohio-3858, at ¶ 20, quoting from State v. Dennis,79 Ohio St.3d 421, 430, 1997-Ohio-372, 683 N.E.2d 1096.
 {¶ 17} "When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact `clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' * * * Because the trier of fact sees and hears the witnesses and is particularly competent to decide `whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility. * * * A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." Stubbs, 2006-Ohio-3858, at ¶ 21, quoting from State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717 and State v. Lawson (Aug. 22, *Page 7 
1997), Montgomery App. No. 16288, 1997 WL 476684.
 {¶ 18} R.C. 2941.145 permits imposition of a three-year mandatory prison term on offenders where the indictment specifies, and a jury finds, that the offender "had a firearm on or about the offender's person * * * while committing the offense and * * * indicated that the offender possessed the firearm." The State must prove:
 {¶ 19} "that the offender possessed a weapon that was capable of firing a projectile by means of an explosive or combustible propellant and was operable or could readily have been rendered operable at the time of the offense.* * * But R.C. 2923.11(B)(2) provides that, in determining whether a weapon is capable of expelling a projectile, `the trier of fact may rely on circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm.' Further, we have repeatedly held that a victim's belief that the weapon is a gun, together with the intent on the part of the accused to create and use that belief for his own criminal purposes, is sufficient to prove a firearm specification."State v. Jeffers (2001), 143 Ohio App.3d 91, 94-95, 757 N.E.2d 417. Accord, State v. Knight, Greene App. No. 2003 CA 14, 2004-Ohio-1941, at ¶ 19 ("both a weapon's existence and its operability may be inferred from the facts and circumstances").
 {¶ 20} In the present case, Greathouse told S.F. that he had a gun and would shoot her and dump her body beside the car. He also threatened several other times to kill S.F. Consequently, even though S.F. never saw the gun, the circumstantial evidence, including representations made by Greathouse, was sufficient to prove the firearm specification.
 {¶ 21} Greathouse also contends that the State presented insufficient evidence of *Page 8 
theft, because the only evidence of record was the victim's unsubstantiated statement that Greathouse forced her to withdraw money from ATM machines.
 {¶ 22} The officer who inspected the Toyota Corolla on the street where it was found testified that he took possession of the property in the vehicle, including an ATM receipt from the ATM where the cash was denied and the victim's ATM card. The police also found a bloody rag beside the vehicle when it was recovered. These items were placed in the property room in the police department. However, the police department disposed of the ATM card, receipt, rape kit, and the rag in June, 2004. At that time, the supervisor of the Special Victims Unit had received an aging card and had signed off on the destruction of the evidence. Because space in the property room is limited, the police department routinely disposes of evidence when it no longer appears to be needed. When the property was destroyed, the officer in charge of the investigation had retired and the case was several years old, with no identified DNA match (the match occurred about six months later). As a result of the disposal, the ATM receipt and card were not available at trial.
 {¶ 23} However, the victim in this case did not need to produce the ATM receipts to show that she had been robbed. Her testimony was sufficient, if believed by the jury, to establish that Greathouse was guilty of aggravated robbery, in that he had a deadly weapon under his control and indicated that he possessed the weapon, while committing or attempting to commit a theft offense. See R.C. 2911.01(A)(1). As we have stressed on numerous occasions, the jury is in the best position to judge the credibility of witnesses and to assign weight to their testimony. State v. Armstrong, Montgomery App. No. 19655, 2005-Ohio-432, at ¶ 33. *Page 9 
 {¶ 24} Furthermore, even if corroboration were required, the fact that an officer found the ATM receipt and card in the Corolla substantiates the victim's account. Accordingly, the theft convictions were supported by sufficient evidence and were not against the manifest weight of the evidence.
 {¶ 25} Greathouse also contends that the jury lost its way in considering the kidnapping, rape, intimidation, and theft charges because of alleged inconsistencies in evidence. For example, Greathouse claims that the lack of tire tracks at Sunwatch Village is inconsistent with the victim's claim that the car was driven through a snowy field. Greathouse also claims the lack of mud, snow, or water inside the car is inconsistent with the markings that would have been left if two people had both exited and re-entered the vehicle.
 {¶ 26} In this regard, we note that the incident occurred on December 26, 2001. S.F. stated that she scraped frost from the car windows that morning, meaning that the weather was cold. While Greathouse got out of the car at Sunwatch Village and came around to the passenger side of the car, there was no indication that the field was muddy, or that anything would have been on his feet, other than snow.
 {¶ 27} The car was found several hours later and was towed to an enclosed police garage, but it was not examined until the following day. The examining officer stated that by the time he saw the car, it had dried out overnight. Therefore, any snow would likely have melted and dried by the time the car was inspected. The officer also stated that he did not find any muddy shoe prints; but, again, there was no evidence that the field was muddy.
 {¶ 28} Furthermore, no evidence was offered as to the lack of tire tracks in the *Page 10 
field. Defense counsel asked S.F. on cross-examination if she would be surprised if the police could not find anything like tire tracks and marks. However, counsel's statement was not evidence, and the police were not questioned about tire tracks.
 {¶ 29} More importantly, when Greathouse was questioned by the police, he did not contend that he and S.F. knew each other or had consensual sex. In fact, he said that he did not know S.F., even after being shown her picture. In view of these facts, there is no innocent explanation for the presence of Greathouse's DNA on a tampon taken from S.F.'s body shortly after the alleged rape.
 {¶ 30} Defense counsel did try to imply at trial that S.F. may have engaged in a process called "geeking," in which an individual trades his or her car for a $20 crack rock and later reports the car stolen. However, no evidence was presented to indicate that such a thing occurred in this case. There was no evidence that S.F. had a history of using drugs or had any criminal involvement in her life. In fact, the evidence was to the contrary. At the time of the incident, S.F. was living with her mother and sister. On the morning in question, she got up at 6:00 a.m., and left the house around 7:00 a.m. to go to her job at a hospital. S.F. had been employed at the hospital for nearly a year and had to be at work by 8:00 a.m. S.F. had also been involved in Christian ministry, and stated that this had been a part of her life since 1990. While these facts are not completely irreconcilable with criminal activity, there is no evidence in the record to indicate that S.F. was ever, in any way, involved with drugs or other criminal conduct.
 {¶ 31} The suggestion that Greathouse may have known S.F. or may have had consensual sexual contact with her is also inconsistent with Greathouse's own statements to the police. In addition, Greathouse admitted to the police that he lived in *Page 11 
close proximity to the location where the abduction occurred and the location where the car was later found abandoned. The jury obviously believed S.F., and we see no basis for concluding that the jury clearly lost its way and created a manifest miscarriage of justice. Accordingly, the Second Assignment of Error is overruled.
 III {¶ 32} Greathouse's Third Assignment of Error is as follows:
 {¶ 33} "TRIAL COUNSEL'S FAILURE TO RAISE THE ISSUE OF ALLIED OFFENSES OF SIMILAR IMPORT RENDERS COUNSEL'S PERFORMANCE DEFICIENT."
 {¶ 34} Under this assignment of error, Greathouse contends that the trial court should have merged the offenses of rape and kidnapping because the offenses occurred with the same animus. Greathouse further claims that trial counsel was ineffective in failing to raise this issue.
 {¶ 35} In order for a conviction or sentence to be reversed based on ineffective assistance of counsel, the defendant must demonstrate:
 {¶ 36} "(a) deficient performance ('errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by theSixth Amendment') and (b) prejudice ('errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable')."State v. Adams, 103 Ohio St.3d 508, 513-514, 2004-Ohio-5845,817 N.E.2d 29, at ¶ 30, quoting from Strickland v. Washington (1984), 466 U.S. 668,687, 104 S.Ct. 2052, 80 L.Ed.2d 674.
 {¶ 37} Although Greathouse's counsel did not specifically raise the issue of allied offenses at trial, he did ask the court to merge the firearm specifications and issue *Page 12 
concurrent sentences, based on the fact that the entire incident lasted only one hour. Counsel also argued that several events took place simultaneously. The trial court did not agree, and imposed consecutive sentences. The court did merge some firearm specifications.
 {¶ 38} The State contends that kidnapping and rape are not allied offenses of similar import under State v. Rance, 85 Ohio St.3d 632, 633,1999-Ohio-291, 710 N.E.2d 699, which requires a comparison of "statutorily defined elements of offenses that are claimed to be of similar import * * * in the abstract." Id. at paragraph one of the syllabus (emphasis in original). Courts have questioned whetherRance is still the correct method for deciding if crimes are allied offenses. For example, in the case of In re Rashid, 163 Ohio App.3d 515,519-520, 2005-Ohio-4851, 839 N.E.2d 411, the First District Court of Appeals noted that the Ohio Supreme Court has resumed the use of fact-based comparisons instead of the abstract comparison called for byRance. See 2005-Ohio-4851, at ¶ 24-25, discussing the Ohio Supreme Court decisions in State v. Adams, 103 Ohio St.3d 508, 526-528,2004-Ohio-5845, 817 N.E.2d 29, and State v. Fears (1999),86 Ohio St.3d 329, 715 N.E.2d 136.
 {¶ 39} In this connection, it should be remembered that State v.Rance, supra, establishes two tests, both of which must be satisfied before two offenses may be considered allied offenses of similar import, and one of these tests is a factual test concerning whether there is more than one animus in the case being analyzed:
 {¶ 40} "Courts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other.' [Citation *Page 13 
omitted.] And if the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus. R.C. 2941.25(B);[State v.] Jones [1997], 78 Ohio St.3d [12], at 14, 676 N.E.2d at 81 (a defendant may be convicted of allied offenses of similar import if the defendant's conduct reveals that the crimes were committed separately or with separate animus)." State v. Rance, supra, at 638-639.
 {¶ 41} Thus, even if the offense of rape cannot, in the abstract, be committed without also committing the offense of kidnapping, a defendant may still be properly convicted and sentenced for both offenses if they are committed with a separate animus, which requires an analysis of the facts of the particular case.
 {¶ 42} In Adams, the defendant had alleged that he could not constitutionally be sentenced for separate convictions for rape and kidnapping because they were "allied offenses of similar import," and no separate animus existed for kidnapping. 2004-Ohio-5845, at ¶ 89. In deciding this issue, the Ohio Supreme Court did not compare the statutory elements of the offenses. Instead, the court used the fact-based analysis that had been previously outlined in State v.Logan (1976), 60 Ohio St.2d 126, 397 N.E.2d 1345. In this regard, the court noted in Adams that:
 {¶ 43} "In State v. Logan * * * we established guidelines to determine whether kidnapping and rape are committed with a separate animus so as to permit separate punishment under R.C. 2941.25(B). We held inLogan that `[w]here the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as *Page 14 
to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions.' * * * Conversely, the Logan court recognized that where the asportation or restraint `subjects the victim to a substantial increase in risk of harm separate and apart from * * * the underlying crime, there exists a separate animus.'" Id. at ¶ 90, quoting fromLogan, 60 Ohio St.2d 126, at paragraph (b) of the syllabus.
 {¶ 44} After making these comments, the Ohio Supreme Court went on to mention several other murder cases involving kidnapping and rape where the court had found a separate animus. 2004-Ohio-5845, at ¶ 92. The court then noted that, in contrast to the facts of these other cases, the State had failed in Adams to present any evidence of movement or restraint of the victim. Accordingly, the Ohio Supreme Court held that:
 {¶ 45} "the evidence is insufficient, under Logan, to establish the separate animus required to separately convict Adams for kidnapping * * * . See State v. Donald (1979), 57 Ohio St.2d 73, 11 O.O.3d 242,386 N.E.2d 1341, syllabus (kidnapping is an offense of similar import to rape); Logan; Jenkins; State v. Fears (1999), 86 Ohio St.3d 329, 344,715 N.E.2d 136 (no separate animus for death-penalty specifications alleging robbery and kidnapping without prolonged restraint, significant asportation, or secret confinement)." Adams, 2004-Ohio-5845, at ¶ 94.
 {¶ 46} Like Adams, the present case involves separate convictions for rape and kidnapping. Because Adams is the most recent Supreme Court decision on this point, the fact-specific analysis used inAdams must be applied in deciding if Greathouse had a separate animus for the crimes of rape and kidnapping. We find that a separate *Page 15 
animus did exist, due to the prolonged nature of the detention of the victim prior to the rape. Greathouse and S.F. drove around for quite some time in the car before Greathouse drove to the location where the rape occurred. In contrast, the defendant in Logan forced the victim down an alley, around a corner, and raped her. Logan,60 Ohio St.2d at 127. The detention in the present case also posed a substantial increase in risk of harm separate from the rape, because Greathouse threatened to crash and burn the car with S.F. inside. Greathouse also threatened to shoot S.F. and dump her body. And finally, the hazard of traveling in an auto for a prolonged period of time increased the potential risk of harm. Accordingly, the crimes were committed with a separate animus and trial counsel was not ineffective in failing to raise the argument that the crimes of rape and kidnapping were allied offenses of similar import.
 {¶ 47} Greathouse's Third Assignment of Error is overruled.
 IV {¶ 48} Greathouse's Fourth Assignment of Error is as follows:
 {¶ 49} "THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S REQUEST FOR NEW COUNSEL."
 {¶ 50} Trial in this case was originally scheduled for October 31, 2005. Victor Hodge was the first defense counsel, but Greathouse filed apro se motion on September 23, 2005, asking for new counsel to be appointed. Greathouse alleged in the motion that Hodge was incompetent and that a conflict existed regarding trial strategies. Greathouse also asked for a private investigator. The court granted the motion for new counsel, appointed David Mesaros as counsel, and set a new trial date *Page 16 
for late November, 2005.
 {¶ 51} Mesaros filed a motion to hire an investigator at State expense, and the motion was granted. The trial was then continued until January 30, 2006. Mesaros also filed a motion to suppress the results of the saliva swabs, which had been gathered without a search warrant. After a hearing in January, 2006, the motion to suppress was overruled. Subsequently, on the morning of trial, Greathouse asked for new counsel to be appointed. Greathouse claimed that he had a witness to the fact that Mesaros had "put his hands" on Greathouse. Greathouse claimed that the witness, a corrections officer, asked why his attorney was mad when he came to see Greathouse. Greathouse told the guard that his attorney wanted him to take a deal, but Greathouse wanted to go to trial.
 {¶ 52} After questioning Greathouse, the trial court rejected the request for counsel. The court pointed out that both of the appointed attorneys were among the best lawyers on the appointed counsel list and were very competent. In addition, the court noted that the attorneys were not appointed to be the defendant's friend, but to function as his lawyer. The court's remarks clearly indicate that she did not believe Greathouse's allegations.
 {¶ 53} We review denial of requests for new counsel for abuse of discretion. State v. Hicks, Greene App. No. 2005-CA-140, 2006-Ohio-6662, at ¶ 25. The right to counsel is guaranteed by the Sixth Amendment to the United States Constitution, but the right is not unqualified and "must be balanced against the effective and efficient administration of justice." Id. at ¶ 24. When courts consider motions for new counsel, they must "balance `any potential prejudice to a defendant against concerns such as a *Page 17 
court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.'" Id., quoting from State v.Unger (1981), 67 Ohio St.2d 65, 67, 423 N.E.2d 1078.
 {¶ 54} In the present case, Greathouse had already been given new counsel once and had also received two trial continuances. In addition, the trial date had been set for several months. Greathouse had filedpro se motions on various issues during the case, but waited until a few minutes before the start of trial to express dissatisfaction with his second appointed attorney. Both of Greathouse's appointed attorneys were also deemed very competent by the trial court. Under the circumstances, we find no abuse of discretion. Compare State v. Elijah, Montgomery App. No. 21805, 2006-Ohio-2635, at ¶ 22 (holding that the trial court acted within its discretion in finding that the defendant's problems with his attorney were fabricated and did not warrant replacing counsel on the day of trial).
 {¶ 55} In view of the preceding discussion, Greathouse's Fourth Assignment of Error is overruled.
 V {¶ 56} Greathouse's Fifth Assignment of Error is as follows:
 {¶ 57} "THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO ORDER A COMPETENCY EVALUATION OF DEFENDANT."
 {¶ 58} Under this assignment of error, Greathouse contends that the trial court erred in failing to order a competency hearing because his colloquy with the court indicated a lack of comprehension of the proceedings, and his behavior indicated mental *Page 18 
deficiencies. As a preliminary matter, we note that Greathouse did not request a competency hearing. Instead, on the morning of trial, Greathouse asked to enter a plea of not guilty by reason of insanity (NGRI). The trial judge responded by stating that she would deal with the matter at the end of the case. At the end of the trial, the judge overruled the request. The judge stated that she had discussed the matter with the trial judge who had originally been assigned to the case. In addition, the judge noted that none of the lawyers had previously raised the NGRI issue. The judge commented that Greathouse seemed to be interested in putting off the trial as long as he possibly could. Finally, the judge noted that she had watched Greathouse's behavior during trial. She stressed that although Greathouse became disruptive at the end of trial, he seemed to understand what was going on, had written things down, and had conferred with defense counsel.
 {¶ 59} Assuming for purposes of argument that the matter was sufficiently raised in the trial court, R.C. 2945.37(B) states that:
 {¶ 60} "In a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion."
 {¶ 61} We have previously noted that in deciding whether to hold a competency hearing on its own motion, the trial court should consider: "(1) doubts expressed by counsel as to competency; (2) evidence of irrational behavior; (3) the defendant's *Page 19 
demeanor at trial; and (4) prior medical opinion concerning competency."State v. Caes (Mar. 9, 2001), Montgomery App. No. 17917, 2001 WL 227356, *6. The trial court's decision is then evaluated for abuse of discretion. Id.
 {¶ 62} In Caes, we considered the circumstances and found that the trial court could reasonably have concluded that the defendant's courtroom outbursts were attempts to "feign mental illness in order to disrupt the trial proceedings and/or avoid conviction." Id. The same conclusion applies here. After unsuccessfully attempting to delay or disrupt the trial by seeking to fire his second appointed counsel, Greathouse waited until nearly the end of trial to disrupt the proceedings by overturning a table and causing a scene. There was no other evidence in the record of instability. For example, Greathouse filed several pro se pleadings that are quite detailed, are neatly written, and show no evidence of rambling or delusions. These prose pleadings include motions for disclosure and for a bill of particulars, both of which were filed shortly before trial. Greathouse's colloquy with the trial court on the morning of trial also reveals no evidence of mental instability or lack of comprehension. Instead, Greathouse was complaining that he and his attorney had conflicts in how they wanted to approach the case. In addition, Greathouse claimed his attorney had failed to furnish him with certain information, like the investigator's report. As we said, the trial court did not find these allegations credible.
 {¶ 63} Because the trial court did not abuse its discretion in refusing to hold a competency hearing, the Fifth Assignment of Error is overruled.
 VI *Page 20 {¶ 64} Greathouse's Sixth Assignment of Error is as follows:
 {¶ 65} "APPELLANT'S OUTRAGEOUS CONDUCT PREJUDICIALLY AFFECTED HIS RIGHT TO A FAIR TRIAL."
 {¶ 66} As we mentioned, Greathouse disrupted the trial proceedings by tipping over the defense table during the State's closing argument and by yelling an obscenity in front of the jury. Greathouse claims, without supporting authority, that the trial court should have granted his request for a mistrial. We have previously noted that:
 {¶ 67} "Mistrials should be declared only when the ends of justice require it and a fair trial is no longer possible. * * * The grant or denial of an order of mistrial lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. * * * An abuse of discretion means more than a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the court." State v.Locklin, Montgomery App. No. 21224, 2006-Ohio-3855, at ¶ 11 (citations omitted).
 {¶ 68} The trial court in the present case did not abuse its discretion in refusing to order a mistrial. Greathouse chose to engage in disruptive behavior in front of the jury and his choice should not be rewarded. In similar circumstances, courts have refused to find abuse of discretion. See, e.g., State v. James (Feb. 19, 1999), Clark App. No. 98 CA 54, 1999 WL 76815, *4 (refusing to hold the defendant's disruptive conduct a proper ground for mistrial because it "would provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so"), and State v. Tate, Summit App. No. 21943,2005-Ohio-2156, at ¶ 7 (holding that the trial court did not err in denying a motion for mistrial where the defendant's repeated outbursts forced the court *Page 21 
to temporarily shackle defendant and remove him from the courtroom).
 {¶ 69} After Greathouse was removed from the courtroom, the court informed the jury that Greathouse had chosen not to be present for the remainder of the trial. The court also immediately instructed the jury to decide Greathouse's innocence or guilt based only on testimony it heard from the witness stand and exhibits admitted into evidence. These admonitions were repeated when the jury was given instructions for deliberation. Under the circumstances, the trial court did not abuse its discretion in failing to order a mistrial. Accordingly, Greathouse's Sixth Assignment of Error is overruled.
 VII {¶ 70} Greathouse's Seventh Assignment of Error is as follows:
 {¶ 71} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS BY EXCLUDING HIM FROM TRIAL."
 {¶ 72} Under this assignment of error, Greathouse contends that he was denied due process of law because the trial court removed him from the trial without obtaining a waiver of his right of confrontation. In this regard, Crim. R. 43(B) provides that:
 {¶ 73} "Where a defendant's conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with his continued presence, the hearing or trial may proceed in his absence, and judgment and sentence may be pronounced as if he were present. Where the court determines that it may be essential to the preservation of the constitutional rights of the defendant, it may take such steps as are required for the communication of the courtroom proceedings to the defendant." *Page 22 
 {¶ 74} This is consistent with Illinois v. Allen (1970), 397 U.S. 337,343-344, 25 L.Ed.2d 253, 90 S.Ct. 1057, in which the United States Supreme Court noted that:
 {¶ 75} "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant * * *: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." After Greathouse disrupted the trial, the trial judge removed him from the courtroom and allowed him to watch the rest of the trial in another room, on a monitor. The only remaining elements of the trial were part of the closing arguments. The court also recessed court after the State finished the first phase of closing argument, so that defense counsel could confer with Greathouse before beginning closing argument. These procedures were consistent with Crim. R. 43(B), did not deprive Greathouse of his due process rights, and did not cause any prejudice. Compare State v. Chambers (July 13, 2000), Franklin App. No. 99AP-1309,2000 WL 963890, *4 (holding that the defendant was not prejudiced by being excluded from the courtroom after his outburst).
 {¶ 76} Based on the preceding discussion, Greathouse's Seventh Assignment of Error is overruled.
 VIII {¶ 77} Greathouse's Eighth Assignment of Error is as follows: *Page 23 
 {¶ 78} "THE TRIAL COURT ERRED IN IMPOSING COURT COSTS AS APPELLANT WAS INDIGENT."
 {¶ 79} Under this assignment of error, Greathouse contends that trial counsel was ineffective because he failed to request a hearing on Greathouse's ability to pay court costs. According to Greathouse, R.C. 2929.28(B) authorizes trial courts to impose community service in lieu of court costs for indigent defendants.
 {¶ 80} R.C. 2929.28 does not apply to this case because that particular statute deals with types of financial sanctions trial courts can impose in misdemeanor cases. State v. Johnson, 164 Ohio App.3d 792,799, 2005-Ohio-6826, 844 N.E.2d 372, at ¶ 20. Greathouse was not convicted of any misdemeanors. Instead, he was convicted of five felonies and accompanying firearm specifications.
 {¶ 81} The statute under which court costs are imposed is R.C. 2947.23. The Ohio Supreme Court has held that R.C. 2947.23 "does not prohibit a court from assessing costs against an indigent defendant; rather it requires a court to assess costs against all convicted defendants." State v. White, 103 Ohio St.3d 580, 582, 2004-Ohio-5989,817 N.E.2d 393, at ¶ 8. After the White decision was issued, the Ohio Supreme Court further stated that:
 {¶ 82} "Costs must be assessed against all defendants. R.C. 2947.23;White, 103 Ohio St.3d 580, 817 N.E.2d 393, at ¶ 8. However, we also held in White that a judge has discretion to waive costs assessed against an indigent defendant. Id. at ¶ } 14. Costs are assessed at sentencing and must be included in the sentencing entry. R.C. 2947.23. Therefore, an indigent defendant must move a trial court to waive payment of costs at the time of sentencing. If the defendant makes such a motion, then the issue is *Page 24 
preserved for appeal and will be reviewed under an abuse-of-discretion standard. Otherwise, the issue is waived and costs are res judicata."State v. Threatt, 108 Ohio St.3d 277, 282, 2006-Ohio-905,843 N.E.2d 164, at ¶ 23.
 {¶ 83} In Threatt, the defendant failed to file a motion to waive costs until after the trial court imposed sentence and assessed costs. The Ohio Supreme Court, therefore, found that the defendant had waived any right to appeal the costs. Id. at ¶ 25. Since Greathouse similarly failed to raise the issue of costs with the trial court, this matter has not been preserved for appeal. Accord, State v. Phillips, Fulton App. No. F-05-032, 2006-Ohio-4135, at ¶ 14 (refusing to consider costs issue on appeal).
 {¶ 84} We are aware that the assignment of error is couched in the context of ineffective assistance of counsel. However, the same claim could have been made in Threatt, because the defendant's attorney failed to raise the issue in the trial court. Nonetheless, the Ohio Supreme Court concluded that the issue was waived and was not preserved for appeal. We also note that Greathouse's sole argument is that he should have been allowed to perform community service. Since Greathouse was sentenced to fifty years in prison, the suggestion of community service is impractical.
 {¶ 85} Accordingly, the Eighth Assignment of Error is overruled.
 IX {¶ 86} The remaining issue is Greathouse's First Assignment of Error, which is as follows:
 {¶ 87} "STATE v. FOSTER."
 {¶ 88} Under this assignment of error, Greathouse argues that the case must be *Page 25 
remanded for re-sentencing under State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, 845 N.E.2d 856, because his appeal was pending on direct review when Foster was decided. The sentencing hearing in this case was held on February 22, 2006, and the termination entry was filed on February 24, 2006. Foster was subsequently decided on February 27, 2006. Greathouse filed his appeal from the trial court judgment on March 22, 2006.
 {¶ 89} The State argues that the sentence should be upheld because it complies with the requirements of Ohio's sentencing guidelines both before and after Foster. However, we have consistently reversed and remanded cases for re-sentencing that were pending when Foster was decided, relying on ¶ 104 of Foster. See, e.g., State v. Houston, Champaign App. No. 06CA-11, 2007-Ohio-868, at ¶ 10 (reversing and remanding for re-sentencing, where the defendant was sentenced to more than minimum and consecutive sentences prior to Foster and the appeal time had not yet expired when Foster was decided); State v. Hardin, Darke App. No. 06-CA-1685, 2007-Ohio-572, at ¶ 4-9 (reversed and remanded for re-sentencing because the trial court made judicial findings of fact regarding imposition of more than minimum and consecutive sentences); and State v. Deloach, Montgomery App. No. 21422,2006-Ohio-6303, at ¶ 22 (noting that we have followed the mandate to reverse and remand under Foster in all cases pending on direct review when Foster was decided, regardless of whether the defendant raisedBlakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403, in the trial court).
 {¶ 90} The trial court in the present case imposed greater than minimum sentences on all counts; maximum sentences on counts one, two, and five, and *Page 26 
consecutive sentences on all counts, based on various factual findings that are no longer required under Foster. Accordingly, the First Assignment of Error is sustained.
 X {¶ 91} Greathouse's First Assignment of Error having been sustained, and his other assignments of error having been overruled, his sentence is Reversed, and this cause is Remanded for re-sentencing in accordance with State v. Foster, supra.
DONOVAN, J., and WALTERS, V.J., concur.
(Hon. Sumner E. Walters, retired from the Third Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio). *Page 1