[Cite as *State v. Lauderdale*, 2016-Ohio-3357.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case Nos. 26454 and 26456 |
| | : | |
| v. | : | Trial Court Case Nos. 2014-CR-1612 |
| | : | and 2012-CR-0812 |
| MICHAEL L. LAUDERDALE | : | |
| | : | (Criminal Appeal from |
| *Defendant-Appellant* | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of June, 2016.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, 131 North Ludlow Street, Suite 1210, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Michael L. Lauderdale, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of aggravated robbery with an attendant firearm specification in Case No. 2014-CR-1612. Lauderdale contends his conviction was not supported by sufficient evidence and was otherwise against the manifest weight of the evidence. Lauderdale also argues that the State engaged in prosecutorial misconduct during its closing argument.

{¶ 2} In addition to that case, Lauderdale also appeals from the decision of the Montgomery County Court of Common Pleas revoking his community control sanctions in Case No. 2012-CR-0812. Lauderdale claims his community control sanctions were improperly revoked because the revocation was based on the aggravated robbery conviction in Case No. 2014-CR-1612, which as noted above, Lauderdale claims was not supported by sufficient evidence and was otherwise against the manifest weight of the evidence.

{¶ 3} Because Lauderdale's two appeals are interrelated, they have been consolidated and reviewed together for purposes of issuing this opinion. For the reasons outlined below, Lauderdale's conviction in Case No. 2014-CR-1612 and the revocation of his community control sanctions in Case No. 2012-CR-0812 will be affirmed.

**Facts and Course of Proceedings**

{¶ 4} On June 3, 2014, Lauderdale was indicted for one count of aggravated robbery in violation of R.C. 2911.01(A)(1), a felony of the first degree, with a three-year firearm specification. The charge stemmed from allegations that on May 2, 2014,

Lauderdale robbed the victim, Joseph Dillon, at gunpoint while Dillon was walking down an alley between East Norman and Fairview Avenues located in the city of Dayton, Montgomery County, Ohio. Lauderdale pled not guilty to the charge and the matter proceeded to a three-day jury trial that concluded on October 8, 2014.

{¶ 5} At trial, Dillon testified that on the afternoon of the day in question, he was walking down the aforementioned alley to purchase cigarettes at a nearby store when he saw three males walking toward him. Being a resident of the area, Dillon testified that he did not recognize any of the men, but noticed that one of them was lingering behind the other two. Dillon then testified that as the three men made their way toward him, he heard a gun "rack" and saw the third man who had been lingering behind jump over to him. According to Dillon, the man then grabbed his right arm, spun him around, and ordered him to the ground. As this occurred, Dillon testified that he saw part of a black pistol. Dillon further testified that as he was lying face down on the ground he felt the pistol pressed against the back of his head and the man's knee pressed against his back.

{¶ 6} Continuing, Dillon testified that the man searched all of his pockets and took $35 in loose cash, his cell phone, and his wallet. The cash was in denominations of a $20, $10, and $5 bill. Dillon testified that he had folded the $10 bill into quarters (folded in half and then folded in half again), whereas the $20 and $5 bills were simply folded in half. Dillon also testified that after emptying his pockets, the man grabbed his glasses from off his face and told him to stay on the ground. Thereafter, Dillon heard the three men walk away. Once the men were gone, Dillon testified that he got up and ran to his house to look for his cell phone in order to call 9-1-1. However, when he arrived at his house, Dillon realized that his cell phone had been stolen during the robbery. Dillon then

went to his neighbor's house and called 9-1-1 from there.

{¶ 7} The recording of Dillon's 9-1-1 call was admitted into evidence. During the call, Dillon told the operator that he was robbed at gunpoint by "one big black guy and two skinnier black guys" and explained that the bigger man was the one who actually performed the robbery. He described the big man as wearing "white, blue jeans," but he did not know what the other two men were wearing. Dillon also told the operator that the men had left on foot toward the Dollar General on East Fairview Avenue.

{¶ 8} A few minutes after reporting the incident, Sergeant Mark Spiers of the Dayton Police Department arrived at Dillon's house and made contact with Dillon. Dillon then told Spiers what had happened and gave him a description of the individual who had robbed him. At trial, Dillon testified that he got a good look at the man who robbed him and described him as a dark-skinned black male in his mid-twenties or thirties who weighed 220 to 225 pounds and was roughly 5'10" to 5'11" tall. Dillon testified that the man was wearing silver, clear-lensed glasses, blue jeans, and a sweater that was navy blue with a design that looked like hundreds of white stars, snowflakes, flowers, or splotches. Dillon also testified that the man was wearing a watch, belt, and no hat.

{¶ 9} Spiers testified that Dillon described the suspect as being 5'10" or 5'11" with a dark complexion, and wearing silver glasses, blue jeans, and a blue t-shirt with dots or stars in the middle of the chest. The incident detail history log admitted into evidence indicated that Spiers broadcast a similar description noting that the suspect was wearing blue jeans, a blue shirt or jacket, was 5'10", stocky, and in his mid-twenties. Spiers testified that his dispatch was based on the description provided by Dillon.

{¶ 10} After Spiers obtained Dillon's description of the suspect, he put Dillon in his

cruiser and drove around the area to see if they could locate the suspect. Approximately 15 minutes into their drive, Spiers testified that they came upon two individuals walking past a barbershop located at 3138 North Main Street, which is near Knecht Drive and approximately 12 blocks from where the robbery took place. According to Spiers, Dillon indicated that one of the individuals walking past the barbershop was the man who had robbed him. Spiers testified that the individual Dillon pointed out had a dark complexion, was wearing silver glasses, and had on a light blue shirt. The individual was later identified as Lauderdale.

{¶ 11} Spiers testified that Lauderdale and his companion looked nervous as he drove by them in his cruiser. Specifically, Spiers saw the two men step back toward the door of the barbershop and go inside the building. Thereafter, Spiers immediately pulled into the parking lot and asked Dillon if Lauderdale was the individual who had robbed him. To this, Spiers testified that Dillon was adamant that Lauderdale was the man who had robbed him, but that Dillon did not recognize the other individual who was with him.

{¶ 12} Both Dillon and Spiers testified that Dillon did not have his glasses on at the time he identified Lauderdale as his assailant. However, Dillon testified that without his glasses he was only prevented from seeing things up close. Dillon testified that, while blurry, he could still see from 15 to 20 feet away without his glasses, and that he was able to see distinct facial features from a distance. Dillon specifically testified that he recognized Lauderdale's facial features when he identified him outside the barbershop.

{¶ 13} Spiers testified that once Dillon identified Lauderdale, Dillon began to panic in fear of his safety. In response, Spiers drove to a nearby side street and told Dillon to wait in the cruiser while he went to the barbershop to locate Lauderdale and the other

individual. As he walked towards the barbershop, Spiers testified that he observed Lauderdale and the other individual walking down Knecht Drive. Spiers then immediately yelled for the individuals to stop, but they looked back and continued walking. When Spiers ordered them to stop again, Lauderdale stopped while the other individual took off running.

{¶ 14} During his initial encounter with Lauderdale, Spiers observed a white cell phone in Lauderdale's right hand. Thereafter, Spiers testified that he grabbed Lauderdale, ordered him to the ground, and radioed other police crews about the fleeing subject. In doing so, Spiers testified that his attention was focused on the fleeing suspect for a moment, and that when he returned his attention to Lauderdale, Lauderdale no longer had the white cell phone in his hand. Rather, Spiers observed the white cell phone located two feet from where Lauderdale was positioned on the ground. Sergeant Paul Sanders, who arrived at the scene later, also testified that he saw the cell phone lying on the ground near Lauderdale. Spiers testified that he initially thought the phone was Lauderdale's, but later discovered that it was actually Dillon's cell phone that had been stolen during the robbery. Lauderdale does not dispute that the cell phone located near his person belonged to Dillon.

{¶ 15} On cross-examination, Spiers identified the clothing that Lauderdale was wearing at the time he was booked into jail. The clothing included a blue t-shirt with a black logo on the front, a large cross necklace that had stars on the end of the cross, blue jeans, and a black hat. Image stills from a security video taken at a local convenience store next to the barbershop were admitted into evidence and depict Lauderdale wearing the aforementioned items of clothing and accessories while purchasing a bottle of

Gatorade just prior to his arrest. The stills show Lauderdale approaching the store's counter to purchase the Gatorade at 2:46 p.m. The incident history detail of Dillon's 9-1-1 call indicates that Dillon reported the robbery at 2:25 p.m. and told the operator that the robbery had happened just five minutes prior.

{¶ 16} Spiers also testified that Lauderdale had $32.78 in cash on his person when he was arrested. The denominations were a $20 bill, a $10 bill, two $1 bills, and change. Spiers identified a photograph of the money recovered from Lauderdale, and noted that the $10 bill was folded in the manner described by Dillon. However, no gun was ever found on Lauderdale.

{¶ 17} Lauderdale's mother, aunt, and cousin all testified on Lauderdale's behalf and each of them confirmed that they have never seen Lauderdale with a gun. They also testified that Lauderdale spent the night at his aunt's house on 412 Knecht Drive the night before the robbery. His aunt testified that on the day of the robbery, Lauderdale was at the house when she left at 7:15 a.m., but that he was no longer there when she returned at noon. Lauderdale's cousin testified that Lauderdale was still at 412 Knecht Drive when he woke up, and although he could not remember the time, he claims he was with Lauderdale until Lauderdale left to get a haircut approximately five or ten minutes prior to Lauderdale's arrest. His cousin also confirmed that Lauderdale was wearing a blue shirt, blue jeans, a black hat, a cross necklace, and silver glasses. In addition, Lauderdale's mother testified that her son is 20 years old, 250 to 255 pounds, and 6'3" or 6'4" tall. She also testified that she has never seen her son wear a blue sweater with hundreds of white stars or flowers on it.

{¶ 18} After the presentation of evidence, the jury deliberated and found

Lauderdale guilty as charged. The trial court then sentenced Lauderdale to three years in prison for aggravated robbery and an additional three years for the firearm specification to be served consecutively for a total prison term of six years. As a result of his conviction, Lauderdale's community control sanctions were revoked in Case No. 2012-CR-0812.

{¶ 19} Lauderdale now appeals from his conviction, as well as from the revocation of his community control sanctions, raising three assignments of error for review.

**First Assignment of Error**

{¶ 20} Lauderdale's First Assignment of Error is as follows:

THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE

EVIDENCE, AND THE EVIDENCE PRESENTED WAS INSUFFICIENT, AS

A MATTER OF LAW, TO PROVE THE APPELLANT'S GUILT BEYOND A

REASONABLE DOUBT.

{¶ 21} Under his First Assignment of Error, Lauderdale disputes the legal sufficiency and manifest weight of the evidence to sustain his aggravated-robbery conviction with the attendant firearm specification.

{¶ 22} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to

the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 23} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 24} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014-Ohio-3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL

476684, *4 (Aug. 22, 1997). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 2d Dist. Champaign No. 97 CA 03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 25} As noted above, Lauderdale was found guilty of aggravated robbery in violation of R.C. 2911.01(A)(1) with an attendant three-year firearm specification. R.C. 2911.01(A)(1) provides that: "No person in attempting or committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]" A "theft offense" is, among other things, a violation of R.C. 2911.01 (aggravated robbery) and R.C. 2911.02 (robbery). R.C. 2913.01(K)(1). A "deadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). "For purposes of establishing the crime of aggravated robbery, a jury is entitled to draw all reasonable inferences from the evidence presented that the robbery was committed with the use of a gun, and it is not necessary that the prosecution prove that the gun was capable of firing a projectile." *State v. Vondenberg*, 61 Ohio St.2d 285, 401 N.E.2d 437 (1980), syllabus.

{¶ 26} With respect to the firearm specification, a mandatory three year prison term is permitted where the indictment specifies and the jury finds "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offenses." R.C. 2941.145(A).

" 'Firearm' means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1) "When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2).

{¶ 27} "Both a firearm's existence and its operability may be inferred from the surrounding facts and circumstances. It is not necessary to admit the firearm used during the crime in evidence in order to establish a firearm specification." *State v. Vann*, 2d Dist. Montgomery No. 22818, 2009-Ohio-5308, ¶ 27, citing *State v. Murphy*, 49 Ohio St.3d 206, 551 N.E.2d 932 (1990). (Other citation omitted.) "A victim's belief that the weapon is a gun, together with the intent on the part of the accused to create and exploit that belief for his own criminal purposes, is sufficient to prove a firearm specification." *Id.*, citing *State v. Greathouse*, 2d Dist. Montgomery No. 21536, 2007-Ohio-2136.

{¶ 28} In this case, the State presented evidence demonstrating that during the afternoon of May 2, 2014, Dillon was robbed at gunpoint as he was walking down an alley between East Norman and East Fairview Avenues. Specifically, Dillon testified that during the robbery he heard a gun "rack" and saw part of a black pistol as one of three men grabbed his right arm, spun him around, and told him to get on the ground. Dillon also testified that he felt the pistol against the back of his head as the man stole his cell phone, wallet, $35 cash, and the glasses off his face. Dillon later identified Lauderdale

as the man who had robbed him.

**{¶ 29}** The foregoing testimony clearly satisfies the elements of aggravated robbery and the attendant firearm specification. Nevertheless, Lauderdale, maintains that his conviction is against the manifest weight of the evidence, as he claims the weight of the evidence fails to establish that he was the individual who robbed Dillon at gunpoint.

**{¶ 30}** In support of this claim, Lauderdale relies on Dillon's description of the robber, claiming the description was inconsistent with Lauderdale's actual appearance. Specifically, Lauderdale points to the fact that during Dillon's 9-1-1 call, Dillon told the operator that the assailant was wearing "white" jeans when his jeans were actually blue. However, the recording of the 9-1-1 call admitted into evidence establishes that Dillon advised the operator that the assailant was wearing "white," and then Dillon paused for a moment and said "blue jeans." The manner of Dillon's statement on the recording does not indicate that he was describing the jeans as being white; rather, the pause in his statement indicates that he was referring to another article of clothing. When confronted with the discrepancy regarding the color of the jeans at trial Dillon testified that he thought he had said the assailant was wearing "blue jeans and blue and white on his shirt." Trial Trans. (Oct. 6, 2014), p. 54-55. Dillon also explained that he "was shook up at the time and * * * not sure that he said it like that or not." *Id.* Regardless, when Sgt. Spiers met with Dillon just a few minutes after the 9-1-1 call, Dillon advised Spiers that the assailant had on blue jeans and Dillon consistently gave that description throughout the rest of the investigation and at trial.

**{¶ 31}** Lauderdale also points to the fact that Dillon testified his assailant was wearing a navy blue shirt or sweater that had a design on it that looked like hundreds of

white splotches, stars, snowflakes, or flowers on the front, as well as a watch on his arm, a belt, and no hat.  As previously discussed, at the time of his arrest, Lauderdale was wearing a blue t-shirt with a black logo and a large cross necklace.  The evidence also demonstrates that Lauderdale was wearing, or at least had possession of, a black hat. Lauderdale further notes that Dillon described his assailant as being roughly 5'10" or 5'11" tall, when Lauderdale is actually 6'3" or 6'4" tall.

{¶ 32} We agree that there are some inconsistencies with regards to Dillon's description of his assailant's clothing and height.  However, the jury could have reasonably resolved these inconsistencies through other testimony and evidence in the record.  For example, Dillon correctly described Lauderdale's skin tone, silver-framed glasses, and big build.  Dillon also testified that he recognized Lauderdale's distinctive facial features when he saw him standing outside the barbershop.  The evidence indicates that throughout the investigation, Dillon was adamant that Lauderdale was his assailant.  Dillon also testified that he got a good look at Lauderdale as he was walking toward him in the alley, and that he saw Lauderdale as he grabbed him from only a short distance away.  Dillon further testified that his glasses were on at the time he observed Lauderdale in the alley, and that his glasses were not taken from him until after Lauderdale pushed him to the ground.

{¶ 33} While Lauderdale implies that Dillon's lack of glasses caused him to misidentify Lauderdale as the assailant when he saw him outside the barbershop, Dillon testified that his vision impairment is one in which he cannot see up close, but that he is able to see distinctive facial features from a distance.  Also, with respect to Lauderdale's clothing, it is conceivable that Lauderdale could have changed some of his clothing

immediately after committing the crime, as Dillon specifically testified that Lauderdale was wearing a different shirt when he identified him at the barbershop, but that he was wearing the same pair of jeans.

{¶ 34} We also do not find that the difference between the height Dillon estimated and Lauderdale's actual height renders Lauderdale's conviction against the manifest weight of the evidence. Dillon, who is 5'10", testified that he thought he was close to eye level with the assailant, but noted that he "had to look up a little" to look directly into the assailant's eyes. Trial Trans. (Oct. 6, 2014), p. 58. Despite Dillon being adamant that his assailant was not 6'3" or 6'4", and Lauderdale in fact being that height, Dillon testified that even with the perceived height difference, he is sure that Lauderdale is the man who robbed him at gunpoint.

{¶ 35} In addition, there is a plethora of other evidence that the jury could have relied upon in finding Lauderdale guilty. For example, the evidence indicates that Lauderdale had Dillon's cell phone in his possession at the time of his arrest. Sgt. Spiers testified that he saw a white cell phone in Lauderdale's hand as he approached him, and a moment later, he observed the same cell phone on the ground two feet away from Lauderdale. There is no dispute that the white cell phone Spiers observed on the ground was Dillon's.

{¶ 36} In refuting Spiers's testimony that he had possession of Dillon's cell phone, Lauderdale relies on the fact that his DNA was not discovered on the phone. However, the fact that Lauderdale's DNA was not found on the phone does not necessarily mean that he did not have it in his possession. The forensic scientist who tested the DNA swabs taken from the cell phone appeared at trial and testified that it is possible for

someone to touch a cell phone and not transfer their DNA on it. This is demonstrated by the fact that Dillon's DNA was also not discovered on the phone, and as the owner, Dillon would have obviously touched the phone.

{¶ 37} The evidence also demonstrates that Lauderdale had a total of $32.78 in his possession at the time of his arrest, which was after he purchased the bottle of Gatorade at the convenience store next to the barbershop. The total amount of money stolen from Dillon was $35 in denominations of a $20, $10 and $5 bill, and Lauderdale had possession of a $20 bill and a $10 bill that was folded in the same manner that Dillon had folded the $10 bill that was stolen from him. Although no specific evidence was presented as to the cost of the Gatorade purchased by Lauderdale, it would be reasonable for the jury to conclude that the other $2.78 on his person could have been change from breaking the $5 bill at the convenience store.

{¶ 38} Sgt. Spiers also testified that Lauderdale and his companion looked nervous as his cruiser drove by them just prior to them entering the barbershop. While the owner of the barbershop testified that he did not notice anything unusual about Lauderdale or his companion (other than the police following them), the owner testified that neither Lauderdale nor his companion had ever been to the shop for a haircut before and that they left the shop as soon as Spiers's cruiser left the parking lot.

{¶ 39} We also note that the jury was free to believe or disbelieve the testimony of the defense witnesses, who were relatives of Lauderdale and who generally testified that Lauderdale was at his aunt's house at the time of the offense. The credibility of these witnesses was for the jury to determine, and we will not disturb that determination on appeal. Furthermore, the fact that the jury chose to believe Dillon's testimony regarding

his recognition of Lauderdale as his assailant and Spiers's testimony regarding Lauderdale's possession of Dillon's cell phone does not render Lauderdale's conviction against the manifest weight of the evidence.

**{¶ 40}** Based on the evidence before this court, we find the jury did not create a manifest miscarriage of justice in finding Lauderdale guilty of aggravated robbery and the attendant firearm specification. Lauderdale's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. Accordingly, Lauderdale's First Assignment of Error is overruled.

## Second Assignment of Error

**{¶ 41}** Lauderdale's Second Assignment of Error is as follows:

THE PROSECUTING ATTORNEY COMMITTED PROSECUTORIAL MISCONDUCT THAT DEPRIVED APPELLANT OF HIS RIGHT TO A FAIR TRIAL.

**{¶ 42}** Under his Second Assignment of Error, Lauderdale claims the State engaged in prosecutorial misconduct when the prosecutor made the following statement about the height difference during its closing argument:

And also it makes sense that when [Dillon] was getting robbed, when someone is walking up to you, they're not walking at the peak of their height. Most people slouch; they're a little bit lower. And especially when they're about to attack somebody. You don't stand up straight. I'm going to attack you and throw you to the ground. You come in, you use your legs as leverage. That's what football players do, right, when they're going to

tackle somebody. They're not standing up straight. They're getting lower down so they can take you to the ground. That's what happened to Joseph Dillon. That's what the defendant did to him in this case.

Trial Trans. (Oct. 8, 2014), p. 308-309.

{¶ 43} "Generally, prosecutors are entitled to considerable latitude in opening and closing arguments." (Citations omitted.) *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. "A prosecutor may freely comment in closing argument on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn therefrom." (Citation omitted.) *Id.* We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

{¶ 44} Our review of prosecutorial misconduct claims focuses on whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. (Citation omitted.) *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The question is whether the prosecutor's misconduct so infected the accused's trial with unfairness that the accused's convictions came in violation of the right to due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). However, where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be

reversed. (Citation omitted.) *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21.

{¶ 45} Lauderdale failed to object to the statement at issue, so we are limited to a plain-error review. Plain error is not present unless, but for the error complained of, the outcome of the trial would have been different. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. A finding of plain error should be made with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *Id.* at paragraph three of the syllabus.

{¶ 46} Having reviewed the record, we find no plain error in the prosecutor's remarks about Lauderdale possibly not standing up straight and getting lower to the ground. The remarks are reasonable inferences based on Dillon's testimony that Lauderdale appeared to be 5'10" or 5'11" tall and slightly above his own eye level when Lauderdale grabbed him. We further do not find that the outcome of the trial would have been any different had the prosecutor not made the remarks. Again, even when considering the inconsistencies in Dillon's description of his assailant to that of Lauderdale himself, there was an abundance of other evidence linking Lauderdale to the crime. Accordingly, Lauderdale's Second Assignment of Error is overruled.

## Third Assignment of Error

{¶ 47} Lauderdale's Third Assignment of Error is as follows:

REVOCATION OF APPELLANT'S COMMUNITY CONTROL WAS BASED

ENTIRELY ON A CONVICTION THAT MUST BE REVERSED ON

APPEAL.

{¶ 48} Under his Third Assignment of Error, Lauderdale claims the revocation of his community control sanctions in Case No. 2012-CR-0812 was improper because the revocation was based on the previously discussed aggravated robbery conviction in Case No. 2014-CR-1612, a conviction that Lauderdale claims was not supported by sufficient evidence and was otherwise against the manifest weight of the evidence. However, since we have concluded under his First Assignment of Error that his aggravated robbery conviction was supported by sufficient evidence and not against the manifest weight of the evidence, we find Lauderdale's community control sanctions were properly revoked. Therefore, Lauderdale's Third Assignment of Error is overruled.

**Conclusion**

{¶ 49} Having overruled all three assignments of error raised by Lauderdale, we hereby affirm his conviction for aggravated robbery and the firearm specification in Case No. 2014-CR-1612 and the revocation of his community control sanctions in Case No. 2012-CR-0812.

. . . . . . . . . . . . .

DONOVAN, P.J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Meagan D. Woodall
Jeffrey T. Gramza
Hon. James A. Brogan
Hon. Dennis J. Langer