[Cite as *State v. Coleman*, 2018-Ohio-2214.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO  :
   :
   Plaintiff-Appellee   :   Appellate Case No. 27702
   :
v.   :   Trial Court Case No. 2016-CR-2950
   :
BENNIE COLEMAN, JR.   :   (Criminal Appeal from
   :    Common Pleas Court)
   Defendant-Appellant   :
   :

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of June, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ALICE B. PETERS, Atty. Reg. No. 0093945, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

JEFFREY R. MCQUISTON, Atty. Reg. No. 0027605, 130 W. Second Street, Suite 1818, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Bennie Coleman, Jr., was found guilty after a jury trial in the Montgomery County Court of Common Pleas of aggravated robbery with a firearm specification. He received an aggregate 13-year prison sentence.

**{¶ 2}** Coleman appeals from his conviction, claiming that (1) the trial court erred in denying his motion to suppress, (2) there was insufficient evidence that he possessed an operable firearm during the robbery, and (3) the trial court erred in admitting a gun found 18 days after the offense. For the following reasons, the trial court's judgment will be affirmed.

### I. Motion to Suppress

**{¶ 3}** In his first assignment of error, Coleman claims that the trial court erred in failing to suppress the victim's show-up identification as unduly suggestive.

**{¶ 4}** In deciding a motion to suppress, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses. *State v. Pence*, 2d Dist. Clark No. 2013 CA 109, 2014-Ohio-5072, ¶ 7, citing *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996). The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac*, 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, the appellate court must then determine as a matter of law, without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

**{¶ 5}** The evidence at the suppression hearing established the following facts.

{¶ 6} Sometime after 3:00 p.m. on September 22, 2016, Zachary Gold was working at M&G Tattoo Supplies, his father's business on North Dixie Drive in Harrison Township. While Gold talked with a customer, a male wearing a white t-shirt, black shorts, purple gloves, and an orange knit hat entered the store; Gold commented to the man that it was "kind of hot to have a hat on" and asked the man to close the door, which the man did. The man then approached Gold, and when the man was standing approximately five feet from Gold, he pointed a gun at Gold's face and said, "You know what this is" and "Give me everything you got." Gold and the man had a brief verbal exchange, during which Gold gave the man his money and a drawstring bag. Gold testified that the robbery lasted one to 1½ minutes, during which Gold was able to view the man's face and some hair that stuck out from under the hat. Gold testified that he had paid attention to how the man looked. After the man left, Gold heard a gunshot, and he contacted the police.

{¶ 7} The dispatcher broadcast that an armed robbery was in progress at the tattoo supply shop. The dispatch indicated the race and gender of the perpetrator and stated that the man was wearing an orange hat, a white t-shirt, and black shorts. The dispatch also stated that the man had just fled the scene and was heading southbound toward the Dixie Drive-In, which is two businesses south of the tattoo supply store.

{¶ 8} Three detectives with the Montgomery County Sheriff's Office – Bryan Statzer, Patrick O'Connell, and a third detective – heard the broadcast from the Sheriff's Office located on North Dixie Drive less than a quarter mile south of the tattoo supply store. Detective Statzer stated that the drive to the store from the Sheriff's Office takes less than a minute.

{¶ 9} The three detectives, all in plain clothes, went to their assigned unmarked

vehicles and drove northbound toward the tattoo supply store. As Detective Statzer approached the intersection of Palisades Drive and North Dixie Drive (which is two or three businesses south of the Dixie Drive-In), Statzer noticed a man, later identified as Coleman, walking through the grass field on the northwest corner of the intersection toward an apartment complex. Coleman matched the race and gender identified in the dispatch and was wearing a white t-shirt and black shorts. Statzer testified that Coleman was walking slowly and kept looking to the street (on Coleman's left) and behind him (toward the tattoo store). Statzer testified that approximately 1 to 1½ minutes had elapsed between the initial dispatch and when he first noticed Coleman. The detective asked the dispatcher to repeat the suspect's description, and the description matched Coleman, minus the hat.

{¶ 10} Detective Statzer turned onto Palisades Drive and drove toward the apartment complex. When he was close to Coleman, Statzer got out of his car, drew his weapon, identified himself as a law enforcement officer, and called to Coleman to stop and show his hands. (Less than five minutes had elapsed since the initial dispatch.) Coleman did not show his hands and, instead, turned and scaled a wrought-iron fence that separated the field from the apartment complex. Detective O'Connell arrived on the scene and began a foot pursuit. Coleman was quickly apprehended. Coleman was handcuffed, searched incident to his arrest, and placed in a cruiser.

{¶ 11} At 3:19 p.m., Deputy Justin Bone, a uniformed officer, was dispatched to the tattoo supply store, arriving approximately five or six minutes after the dispatch. As Bone spoke with Gold, the deputy received a radio call that detectives had apprehended a man matching the robbery suspect's description. Deputy Bone told Gold that they had

a man who matched the description and asked Gold if he (Gold) would go with him (Bone) to make an identification "or not."   Gold testified that the deputy did not say that they had caught the perpetrator, just that they had a suspect.

{¶ 12} Deputy Bone drove Gold to the apartment complex, approximately one minute away from the store; Gold sat behind the deputy in the cruiser.   Detective Statzer testified that Gold arrived at the apartment complex approximately 7 to 10 minutes after the original broadcast.   As Bone's cruiser approached, Coleman was taken out of the cruiser, in handcuffs.   Gold testified that he saw Coleman through the cruiser's windshield and "identified him [Coleman] before we even got close.   I knew it was him. I saw him from a distance."   Gold estimated that the cruiser got 10 to 15 feet from Coleman, and the deputy asked him to take another look.   Gold testified that the deputy asked, "Do you see the gentleman that robbed you anywhere?"   Bone testified that he asked Gold to tell him "yes or no."   Detective Statzer stated that Gold, who remained in Bone's cruiser, was shown "both forward and side views" of Coleman.   Gold looked at Coleman through the side window of the cruiser and again identified Coleman as the perpetrator.   Bone relayed Gold's identification of Coleman to the detectives.

{¶ 13} Gold further testified his view was not obstructed when he looked at Coleman from the cruiser.   Gold believed that the cruiser's windows had a slight tint, but the deputy refuted that; the cruiser had bars over the side window.   Gold testified that, on the day of the robbery, he was 100 percent certain of the identification.   Gold was also asked to identify Coleman at the suppression hearing, which Gold did, and Gold noted several ways in which Coleman's appearance had changed since the day of the robbery (e.g., shorter hair, no dreadlocks, shorter goatee, maybe a little heavier).

{¶ 14} "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). "Undoubtedly, the showing of one suspect to witnesses is suggestive." *State v. Marshall*, 2d Dist. Montgomery No. 19920, 2004-Ohio-778, ¶ 13. However, even where the pretrial identification procedure is suggestive, the identification is still admissible, as long as the challenged identification itself is reliable. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony"); *State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208, ¶ 8.

{¶ 15} In reviewing the likelihood that the circumstances resulted in a misidentification, courts have considered the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[1] *Neil* at 199-200; *Manson*, 432 U.S. 98; *Bates* at ¶ 9.

{¶ 16} A police officer's use of a show-up, without more, does not violate due

---

[1] We have previously noted that some of the factors identified in *Neil* may bear reconsideration in light of the significant advancement of scientific understanding of memory. *See State v. Frazier,* 2016-Ohio-727, 60 N.E.3d 633, ¶ 18, fn. 1 (2d Dist.); *State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 12, fn. 3. For example, *Neil* and *Manson* direct courts to consider the witness's degree of certainty in the identification, yet studies have repeatedly shown little relationship between certainty and accuracy. Nonetheless, as an intermediate court of appeals, this court must continue to follow the factors articulated in *Neil* and *Manson,* as required by Ohio Supreme Court precedent. *See, e.g., Bates* at ¶ 9; *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 19, ¶ 25; *State v. Keith,* 79 Ohio St.3d 514, 684 N.E.2d 47 (1997).

process.  *Marshall* at ¶ 12, citing *Neil* at 198.   "Show-ups at or near the scene of a crime, that occur shortly after the crime, are not only permissible, but useful, since they can lead to an identification or non-identification while the characteristics of the perpetrator are still fresh in the witness's memory.   However, the show-up must not be unduly suggestive. The defendant bears the burden to prove that a show-up procedure was so suggestive of guilt that it requires suppression." (Citations omitted.)  *State v. McCrary*, 2d Dist. Montgomery No. 23360, 2010-Ohio-2011, ¶ 38.

{¶ 17} In denying Coleman's motion to suppress Gold's show-up identification on the day of the robbery, the trial court noted that "Gold had observed Defendant at close range during the robbery and there is no evidence of hesitation on his part when identifying him.   He remained certain at the hearing that his identification was accurate. Furthermore, the identification was made approximately less than twenty minutes after the incident."   The trial court found that the show-up identification of Coleman by Gold was reliable and that Coleman had "not shown that the show up procedure in this case 'was unnecessarily suggestive and conducive to an irreparable mistaken identification' of him.   *Stovall [v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)]."

{¶ 18} We agree with the trial court's conclusion.   Gold saw the robber enter the store and commented on the man's hat before the robbery began.   Gold testified that he observed the robber's face and portions of his hair, and the two communicated while Gold gave the robber money and his drawstring bag.   The show-up identification occurred shortly after the robbery.   The deputy who transported Gold to the show-up did not tell Gold that officers had caught the perpetrator; rather, he told Gold that they had found someone who matched the description and asked Gold if he would indicate "yes or no" if

he could identify the person. Although Coleman was handcuffed at the time of the show-up, Gold stated that he recognized Coleman as they approached the location where Coleman was being held and that he (Gold) was 100 percent confident in his identification. The trial court did not err in concluding that the show-up identification was not unduly suggestive or conducive to irreparable mistaken identification.

{¶ 19} Coleman's first assignment of error is overruled.

### II. Sufficiency of Evidence regarding the Operability of the Gun

{¶ 20} In his second assignment of error, Coleman claims that there was insufficient evidence presented at trial to support a finding that he possessed an operable firearm during the commission of the offense. Coleman argues that there was no direct or circumstantial evidence that the gun used during the offense was operable, and he notes that the firearm discovered 18 days after the robbery was not capable of being test-fired.

{¶ 21} Coleman does not challenge the sufficiency of the jury's finding that he was the person who committed the robbery. Accordingly, in addressing Coleman's assignment of error, we focus only on the evidence related to the firearm and its operability.

{¶ 22} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 23} Coleman was convicted of aggravated robbery, in violation of R.C. 2911.01(A)(1), which provides: "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]" "Deadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).

{¶ 24} The aggravated robbery charge was accompanied by a firearm specification. R.C. 2941.145 permits imposition of a mandatory three-year prison term where the indictment specifies, and the jury finds "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offenses."

{¶ 25} The statutory definition of a firearm is "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant," and it includes an unloaded firearm and any firearm that is inoperable but that can readily be rendered operable. R.C. 2923.11(B)(1). "When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial

evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm."   R.C. 2923.11(B)(2).

{¶ 26} In *State v. Vann*, 2d Dist. Montgomery No. 22818, 2009-Ohio-5308, we discussed what evidence is sufficient to prove both the existence of a firearm and its operability:

Both a firearm's existence and its operability may be inferred from the surrounding facts and circumstances.   It is not necessary to admit the firearm used during the crime in evidence in order to establish a firearm specification.   *State v. Murphy* (1990), 49 Ohio St.3d 206, 551 N.E.2d 932; *State v. Knight*, Greene App. No. 2003CA14, 2004-Ohio-1941.   A victim's belief that the weapon is a gun, together with the intent on the part of the accused to create and exploit that belief for his own criminal purposes, is sufficient to prove a firearm specification.   *State v. Greathouse*, Montgomery App. No. 21536, 2007-Ohio-2136.

Actions alone, without verbal threats, may be sufficient circumstances to establish the operability of a firearm.   For example, the evidence was sufficient to prove a firearm specification when masked men waived their guns and announced "this is a robbery."   *State v. Reynolds*, 79 Ohio St.3d 158, 679 N.E.2d 1131, 1997-Ohio-304, at fn. 3.   *See also: State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541, 1997-Ohio-52.   In *State v. Melton*, Montgomery App. No. 22591, 2009-Ohio-535, the defendant forced his way into the victim's home, told her to "shush," then pulled out a gun and proceeded to steal items of jewelry from the bedroom.

Because the victim believed the gun was real, she feared for her safety and complied with the defendant's demands. This court found the evidence was sufficient to support the firearm specification. *Id.* at ¶ 18, 36. Furthermore, because the victim in *Melton* was the only witness to testify on this issue, we found that the evidence was uncontroverted and the verdict was not against the manifest weight of the evidence. *Id.* at ¶ 37.

*Vann* at ¶ 27-28. *See also State v. Lauderdale*, 2d Dist. Montgomery Nos. 26454 and 26456, 2016-Ohio-3357 (testimony that victim heard gun "rack," saw part of a gun, and felt a pistol against the back of his head during robbery was sufficient to satisfy the elements of aggravated robbery and the firearm specification); *State v. Million*, 2d Dist. Montgomery No. 24744, 2012-Ohio-1774.

{¶ 27} At trial, Gold testified that he was helping a customer when another man, later identified as Coleman, walked into the tattoo supply store. Gold testified that, after he asked Coleman to shut the front door and inquired about Coleman's hat, "I got a gun put in my face, and [Coleman] said, 'You know what this is, give me everything.' " Gold put his hands in the air as soon as he saw the gun. Gold described the gun, stating, "It was a small – it was subcompact looking gun. And I only [saw] the barrel in the front of it. It was – it looked to be like nickel, or chrome, or something, and around a 9 millimeter, .380; something like that."

{¶ 28} Gold testified that he had money in his pocket and began to reach with his right hand to get it out. Seeing Gold reach down, Coleman asked, "What the f*** are you doing?" Gold testified that he put his hand back in the air and said, "I'm getting the money, it's in my pocket; do you want the money?" Gold then retrieved the money from

his pocket and put it on the counter.   When asked what was going through his mind at that point, Gold testified, "I hope he doesn't shoot me."   Gold stated that he was as "scared as I could be."

{¶ 29} After taking the money, Coleman asked, "Where's the rest?" and Gold responded that his father (who owns the store) collects the money every night and that was all he had.   Coleman had Gold give him Gold's nylon drawstring bag, which was nearby in a small alcove off the main room, as well as Gold's two cellphones.   Gold stated that the gun was turned on him the entire time.

{¶ 30} At that point, Gold asked Coleman what he (Coleman) wanted him (Gold) to do now.   When Coleman did not answer for a second, Gold said, "Do you want me to get on the ground?"   Coleman said, "Yeah, get on the ground."   Gold told Coleman that it would take him a moment to get down due to his (Gold's) broken ankle.   After Gold was lying face-down on the ground, Coleman came over, put his gun against the back of Gold's head, put his knee on Gold's back, and went through Gold's pockets.   Coleman told Gold, "If you get up or call the cops I will f***ing kill you."   Gold testified that he thought that Coleman was going to kill him.

{¶ 31} After searching Gold, Coleman asked, "Where's the ratchet?" which Gold took to mean "Where's the gun?"   Gold responded that he did not have a gun.   Coleman then asked what else in the store was free.   Gold replied, "You have the gun, anything you want."   Coleman pulled on a cabinet door, but it was locked.   Coleman then headed for the front door.   At this point, Coleman heard Gold's customer say, "Please don't kill me, I've got kids."   Coleman said, "N*****, I got kids, too."   Coleman then left the store.

{¶ 32} A few seconds after Coleman left and while he was still on the ground, Gold

heard a single gunshot. Shortly after hearing the gunshot, Gold got up, opened the front door to the store, and looked out; Coleman was far enough away from the building to where Gold felt he could safely leave. Because Coleman had taken Gold's cellphones, Gold went to a nearby business to call the police.

{¶ 33} Detective Statzer located Coleman on a grassy field on the west side of North Dixie Drive, heading toward an apartment complex. Coleman scaled the wrought iron fence between the field and apartment complex, and he was apprehended after a brief foot chase in the complex. A K-9 unit was called to the scene; the dog tracked a scent from the apartment complex to a wooded area behind a business located just south of the Dixie Drive-In, where the deputy found a blue drawstring bag, an orange knit hat, and a pair of bluish rubber gloves. Deputies searched for a gun, but did not locate one.

{¶ 34} On October 10, 2016, Deputy Matthew Bowling was dispatched to the apartment complex on a report that a pistol had been found. Bowling recovered a SCCY semi-automatic handgun from the property manager. Bowling testified that he checked the condition of the gun and noticed that there were "bugs, leaves, [and] moisture all around it." The magazine and takedown lever had some rust, and the gun had some additional damage, such as a missing front sight.[2] Bowling cleared the magazine and pulled the slide back to empty the chamber; a bullet fell out.

{¶ 35} Bowling asked the property manager for the name of the employee who had found the gun, and that employee showed the deputy where the gun was found. The employee took Bowling to the rear of the "very last apartment to the east," which was next to the fence separating the apartment complex from the field.

---

[2] The transcript reads "front side," but this appears to be a typographical error.

{¶ 36} At trial, Gold was asked to look at the gun that was recovered. He testified that the gun that was recovered "look[ed] to be very similar" to the gun that was used in the robbery. Gold explained that his focus had been on the front area of the gun, but the gun looked to be "about the right size, the right [ ] color slide, and everything" to him.

{¶ 37} Detective Brian Shiverdecker, the lead detective for the robbery, testified that the gun recovered on October 10, 2016, was not test-fired because it was not safe to be test-fired.

{¶ 38} Viewing the evidence in the light most favorable to the State, there was sufficient evidence from which the jury could have reasonably concluded that an operable gun was used during the robbery. Coleman displayed the gun and threatened Gold with it throughout the robbery; at one point, Coleman placed the gun to the back of Gold's head while Gold was lying prone on the ground. Coleman threatened to kill Gold if he (Gold) got up or called the police. Coleman's actions with the gun indicated to Gold and Gold's customer that the gun was operable; both were fearful of being killed. This circumstantial evidence was sufficient to establish both the deadly weapon element of aggravated robbery and the firearm specification.

{¶ 39} Coleman points out that the gun found on October 10, 2016 was not test-fired, because it was not safe to do so. There was no evidence that the gun Coleman used was inoperable on September 22, 2016, the date of the robbery; the jury could have reasonably concluded, based on Coleman's threatening behavior and statements, that the gun had been operable at the time of the robbery, and that its condition had deteriorated due to exposure to the elements between September 22 and October 10, 2016.

{¶ 40} Coleman's second assignment of error is overruled.

### III. Admissibility of the Gun

{¶ 41} In his third assignment of error, Coleman claims that the trial court erred in allowing the gun and ammunition found on October 10, 2016, to be admitted into evidence. Coleman asserts that their probative value was substantially outweighed by the danger of unfair prejudice to him. Coleman further asserts that the State presented no evidence as to the chain of custody of the weapon.

{¶ 42} Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 43} A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 44} The trial court could have reasonably concluded that the gun and ammunition were relevant to whether Coleman had a firearm during the offense. Gold testified that the robber used a gun, and Gold provided a general description of the

weapon, including its color, the approximate diameter of the barrel, and the fact that it was a semi-automatic weapon. No gun was recovered on the day of the robbery, but an employee of the apartment complex found a gun in the area where Coleman had attempted to flee from detectives. Gold testified that the gun that was recovered looked very similar to the gun that was used. Although the State could not definitively account for the whereabouts of Coleman's gun between September 22 and October 10, 2016, there was circumstantial evidence that the gun that was recovered was used by Coleman during the robbery, which helped corroborate Gold's testimony that Coleman possessed a firearm during the robbery.

{¶ 45} Moreover, Coleman has not demonstrated that he was unfairly prejudiced by the admission of the gun. As stated above, Gold had already described how the perpetrator threatened him with a gun during the robbery, and Gold described the gun that was used. The gun that was recovered was not the only evidence that Coleman used a firearm during the offense.

{¶ 46} At trial, defense counsel argued during closing argument that the gun was not connected to the robbery. Defense counsel argued that, when Coleman fled from Detective Statzer, the detective lost sight of Coleman for only a few seconds; the detective did not see Coleman with a gun, and Coleman did not have a gun when he was arrested. The officers did not locate a gun on the day of the robbery, and the police canine, which led deputies to Gold's drawstring bag, the orange hat, and bluish gloves, did not lead the officers to the gun. Defense counsel noted that there was no physical evidence connecting the gun to the robbery, and the gun was in poor condition. The jury was able to weigh the evidence to determine whether Coleman possessed a firearm during the

robbery.

**{¶ 47}** In short, the trial court did not abuse its discretion in allowing the admission of the gun and ammunition found on October 10, 2016.  Coleman's third assignment of error is overruled.

## IV. Conclusion

**{¶ 48}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .


WELBAUM, P. J. and DONOVAN, J., concur.


Copies mailed to:

Mathias H. Heck
Alice B. Peters
Jeffrey R. McQuiston
Hon. Barbara P. Gorman